No. 23-2420

*In the*

# United States Court of Appeals

*for the*

# Third Circuit

Marla Knudsen, et al.,

*Plaintiffs-Appellants*,

v.

MetLife Group, Inc.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of New Jersey
No. 2:23-cv-00426-WJM-ESK
Hon. Judge William J. Martini

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Charlie C. Gokey
Engstrom Lee LLC
729 N. Washington Avenue, Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
cgokey@engstromlee.com

*Attorney for Plaintiffs-Appellants*
*Marla Knudsen, et al.*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Appellants Marla

Knudsen, et al. make the following disclosure:

I.    For non-governmental corporate parties please list all parent

corporations:

None.

II.    For non-governmental corporate parties please list all publicly held

companies that hold 10% or more of a party's stock:

None.

III.    If there is a publicly held corporation which is not a party to the

proceeding before this Court but which has a financial interest in the outcome of

the proceeding, please identify all such parties and specify the nature of the

financial interest or interests.

None.

IV.    In all bankruptcy appeals counsel for the debtor or trustee of the

bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2)

the members of the creditors' committee or the top 20 unsecured creditors; and 3)

any entity not named in the caption which is an active participant in the bankruptcy

proceeding.  If the debtor or trustee is not participating in the appeal, this

information must be provided by appellant.

N/A.

Date: October 16, 2023                    ENGSTROM LEE LLC

                                          */s/ Charlie C. Gokey*
                                          Charlie C. Gokey
                                          Engstrom Lee LLC
                                          729 N. Washington Avenue, Suite 600
                                          Minneapolis, MN 55401
                                          Telephone: (612) 305-8349
                                          cgokey@engstromlee.com

                                          *Attorney for Plaintiffs-Appellants*
                                          *Marla Knudsen, et al.*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ......................................................1

ISSUE PRESENTED .......................................................................2

STATEMENT OF RELATED CASES & PROCEEDINGS ...................................2

STATEMENT OF THE CASE ..............................................................2

I.      STATEMENT OF FACTS. ......................................................2

        A.      Plaintiffs Participate in the Plan and Pay Associated Costs ..................2

        B.      MetLife Hires Express Scripts on Behalf of the Plan. .........................5

        C.      MetLife Seizes Drug Rebates from the Plan and Passes the Plan's
                Losses on to Participants. .......................................................6

II.     PROCEDURAL HISTORY. ....................................................10

SUMMARY OF THE ARGUMENT ....................................................11

STANDARD OF REVIEW ...............................................................13

ARGUMENT .................................................................................14

I.      PLAINTIFFS-APPELLANTS SATISFY THE INJURY-IN-FACT
        COMPONENT OF ARTICLE III STANDING. ...........................................14

        A.      Plaintiffs-Appellants allege a personal financial loss, not a mere
                diminution of Plan assets in which they hold no interest ....................15

iii

B.     The financial loss Plaintiffs-Appellants allege suffices to show an Article III injury in the ERISA context, just as in any other. .............18

C.     Plaintiffs have adequately alleged their financial injury....................20

II.    THE DISTRICT COURT CONFLATED CONSTITUTIONAL AND STATUTORY STANDING, WHICH INDEPENDENTLY MERITS REVERSAL AND REMAND......................................................................25

CONCLUSION .................................................................................................28

CERTIFICATE OF COMPLIANCE......................................................30

ELECTRONIC DOCUMENT CERTIFICATE ......................................31

CERTIFICATE OF BAR ADMISSION ................................................32

CERTIFICATE OF PERFORMANCE OF VIRUS CHECK ................33

CERTIFICATE OF SERVICE .............................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*,
    836 F.3d 963 (8th Cir. 2016) ...........................................................................24

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
    821 F.3d 352 (2d Cir. 2016) ...........................................................................26

*Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*,
    861 F.2d 1406 (9th Cir. 1988) ........................................................................23

*Boley v. Universal Health Servs., Inc.*,
    36 F.4th 124 (3d Cir. 2022) ............................................................................24

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) .................................................................... 24, 28

*Brotherston v. Putnam Invs., LLC*,
    907 F.3d 17 (1st Cir. 2018)................................................................................8

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017)............................................................................18

*CIGNA Corp. v. Amara*,
    563 U.S. 421 (2011)...................................................................................5, 23

*Cole v. General Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ..........................................................................26

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)......................................................................... 11, 18, 21

*Danvers Motor Co. v. Ford Motor Co.*,
    432 F.3d 286 (3d Cir. 2005) .................................................. 1, 11, 18, 20, 28

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ..........................................................................26

*Denton v. First Nat. Bank of Waco, Texas*,
    765 F.2d 1295 (5th Cir. 1985) .....................................................................9, 21

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) ........................................................................16

*Finkelman v. Nat'l Football League*,
    877 F.3d 504 (3d Cir. 2017) .................................................................... 20, 28

*Gonzalez de Fuente v. Preferred Home Care of New York, LLC*,
    No. 18-cv-06749, 2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020) .................... 19

*Graden v. Conexant Sys. Inc.*,
    496 F.3d 291 (3d Cir. 2007) ........................................................... 12, 25, 27

*Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*,
    810 F.3d 116 (3d Cir. 2016) ............................................................ 26

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011) ......................................................................... 27

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009) ............................................................ 19

*John v. Whole Foods Mkt. Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017) ............................................................ 28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ......................................................................... 25

*Loren v. Blue Cross & Blue Shield of Michigan*,
    505 F.3d 598 (6th Cir. 2007) ........................................................... 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................... 20, 28

*McCravy v. Metro. Life Ins. Co.*,
    690 F.3d 176 (4th Cir. 2012) ........................................................... 23

*Menkes v. Prudential Ins. Co. of Am.*,
    762 F.3d 285 (3d Cir. 2014) ........................................................... 23

*Muir v. Navy Fed. Credit Union*,
    529 F.3d 1100 (D.C. Cir. 2008) ...................................................... 24

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
    446 U.S. 359 (1980) ........................................................................... 7

*Nat'l Sec. Sys., Inc. v. Iola*,
    700 F.3d 65 (3d Cir. 2012) ........................................................ 12, 23, 24

*Perelman v. Perelman*,
    793 F.3d 368 (3d Cir. 2015) ..................................................... 15, 16, 17

*Potter v. Cozen & O'Connor*,
    46 F.4th 148 (3d Cir. 2022) ..................................................... 12, 13, 25, 27

*Smith v. Med. Benefit Administrators Grp.*, Inc.,

639 F.3d 277 (7th Cir. 2011) ...........................................................15

*Thole v. U. S. Bank N.A.*,
    140 S. Ct. 1615 (2020)................................. 1, 11, 14, 15, 16, 17, 18

*Tyler v. Hennepin Cnty., Minnesota*,
    598 U.S. 631 (2023)..........................................................................20

*United States v. Catala*,
    870 F.3d 6 (1st Cir. 2017)...............................................................26

*Wachtell, Lipton, Rosen & Katz v. Comm'r*,
    64 T.C.M. (CCH) 128 (T.C. 1992), *aff'd*, 26 F.3d 291 (2d Cir. 1994)...........9

*Wallach v. Eaton Corp.*,
    837 F.3d 356 (3d Cir. 2016) ...........................................................25

## Statutes

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. § 1331 ...............................................................................1

29 U.S.C. § 1001 *et seq*...............................................................1, 10

29 U.S.C. § 1103 ...............................................................................7

29 U.S.C. § 1108(c)(2)........................................................................7

## Rules

Federal Rules of Civil Procedure 12(b) ............................. 10, 12, 13, 24, 25, 26, 27

## Other Authorities

Christine Eibner, et al., *Employer Self-Insurance Decisions and the Implications of the Patient Protection and Affordable Care Act as Modified by the Health Care and Education Reconciliation Act of 2010* ("*Employer Self-Insurance Decisions*") Rand Health (Mar. 2011)..........................................3, 4

Department of Labor, Advisory Op. No. 93–14A,
    1993 WL 188473 (May 5, 1993) ....................................................6

U.S. Department of Labor, *Understanding Your Fiduciary Responsibilities Under a Group Health Plan* (Sept. 2019) ................................................7

U.S. Government Accountability Office, *CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending* (Sept. 2023) .................7, 21

U.S. Government Accountability Office, *Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* (July 2019)................7

United States Government Accountability Office, *Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* (July 2019) ..............................................................................................7

**INTRODUCTION**

MetLife Group, Inc. illegally took $65,237,379 from a trust used to fund its employees' health benefits under the MetLife Options & Choices Plan. It then passed the Plan's losses on to the Plan's members, including Plaintiffs-Appellants Marla Knudsen and William Dutra. To make up the Plan's losses, MetLife forced Plaintiffs-Appellants to pay higher health insurance premiums. Put simply, MetLife caused Plaintiffs-Appellants to lose money.

"Monetary harm is a classic form of injury-in-fact," such as where the plaintiff has been "forced to pay money it otherwise would have kept for itself." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005). The district court nonetheless held that Plaintiffs-Appellants' monetary injury does not satisfy Article III here. The core of the district court's holding is that this type of monetary injury does not suffice where a plaintiff brings an ERISA claim related to "a defined benefit-type Plan." (1 App. 10-12 (Opinion)). But "[t]here is no ERISA exception to Article III," and ERISA claims require only "ordinary Article III standing analysis" that courts should not "make . . . more complicated than it needs to be. *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). This Court should reverse.

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Employee Retirement Income Security Act of 1974, as

1

amended, 29 U.S.C. § 1001 *et seq*. ("ERISA"). This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is taken from a final order of dismissal from the district court disposing of the entire case.

## ISSUE PRESENTED

Whether the district court erred in concluding that Plaintiffs-Appellants' allegations of personal financial harm are insufficient, as a matter of law, to establish the injury-in-fact component of Article III standing. This issue was raised in Defendant-Appellee's motion to dismiss ("MTD"), 2 App. 33-37 (MTD), disputed in Plaintiffs-Appellants' opposition ("Opp."), 2 App. 78-85 (Opp.), and ruled upon in the district court's order granting the motion to dismiss. 1 App. 10-12 (Opinion).

## STATEMENT OF RELATED CASES & PROCEEDINGS

This case is before the Court for the first time. Plaintiffs-Appellants are not aware of any related case decided or pending before this Court or any other court.

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS.

#### A.    Plaintiffs Participate in the Plan and Pay Associated Costs.

This case concerns the MetLife Options & Choices Plan (the "Plan"), a benefit plan MetLife established for its employees and their families. 2 App. 116 (Compl. ¶ 15). As relevant here, Plan participants can elect to receive health

insurance coverage through the Plan, which includes prescription drug benefits. *Id.*
116 (Compl. ¶ 18).

The Plan is self-funded. *Id.* 116 (Compl. ¶ 19). Where a health plan is self-
funded, rather than rely on a third-party insurer, employers "pay for health plan
claims either out of [their] general assets or through a trust, in which cash is set
aside for payments related to the health plan," and which "may include employee
contributions as well as other monies." Christine Eibner, et al., *Employer Self-
Insurance Decisions and the Implications of the Patient Protection and Affordable
Care Act as Modified by the Health Care and Education Reconciliation Act of
2010* ("*Employer Self-Insurance Decisions*") at 29, Rand Health (Mar. 2011),
https://tinyurl.com/4t6fekus. Here, the Plan's health benefits are paid out of a trust
established by MetLife to hold the Plan's assets. 2 App. 116 (Compl. ¶ 19).

Two main sources of funding for that trust are (1) contributions from Plan
participants paid in the form of health insurance premiums and (2) employer
contributions paid by MetLife as a type of employee compensation. *Id.* 116
(Compl. ¶ 20). Health insurance premium rates for self-insured plans are typically
based on an "employer's estimate of the cost of providing a group health plan to
[its] employee[s]." Eibner, et al., *Employer Self-Insurance Decisions, supra* at 38.
Consistent with this, MetLife determines the amount that each of its employees
must pay in premiums by applying a formula to the projected cost of funding their
medical benefits, accounting for any other Plan assets available to fund those

3

benefits. 2 App. 116, 120 (Compl. ¶¶ 20, 30). MetLife generally requires Plan

participants to cover around 30% of the contributions to the Plan, while MetLife

pays the balance. 2 App. 116-117 (Compl. ¶¶ 20-21).

In addition to premiums, MetLife requires Plan participants to subsidize the

Plan in the form of out-of-pocket costs for medical care. *Id.* at 117 (Compl. ¶ 22).

Plan participants are required to pay deductibles (an amount the insured must pay

for medical services or drugs before the Plan will pay anything); coinsurance (a

percentage of the cost of medical services or drugs); and copays (fixed amounts

paid for the cost of medical services or drugs). *Id.* A health plan's out-of-pocket

costs are tied to the expense of funding the plan, and higher out-of-pocket costs

shift the financial burden away from the plan sponsor to plan members. Eibner, et

al., *Employer Self-Insurance Decisions, supra* at 148-50.

As explained in a study commissioned by the Department of Labor, the

"utility" of a health plan "depends on the expected value of out-of-pocket

expenditures, the premium, the variance of the out-of-pocket-expenditures

distribution, and the expected utility for health care services received under the

plan." *Id.* at 150. In other words, changes to the costs borne by participants in a

self-insured health plan impact the plan's value to participants and the level of

benefits they enjoy.

Plaintiffs are individuals who participated in and received health insurance

through the Plan. 2 App. 115 (Compl. ¶¶ 13-14). Both paid monthly premiums

4

totaling hundreds of dollars per month for health benefits, as well as deductibles, coinsurance, and copayments. *Id.*

### B.    MetLife Hires Express Scripts on Behalf of the Plan.

Express Scripts is a pharmacy benefit manager (or PBM). 2 App. 117 (Compl. ¶ 22). PBMs manage and administer prescription drug benefits for health plans. 2 App. 118-119 (Compl. ¶¶ 26-27). PBMs (including Express Scripts) often negotiate rebates on drug purchases made by members of the health plans they help administer, which they typically pass along to the client health plan after receiving them. *Id.* at 119 (Compl. ¶ 27).

MetLife hired Express Scripts as the Plan's PBM to manage and administer the Plan's prescription drug benefits. *See id.* at 119 (Compl. ¶ 27). The Plan paid Express Scripts for its services out of the Plan's own assets in amounts ranging from $3.2 to $6.3 million annually during the relevant period. 2 App. 117, 119-120 (Compl. ¶¶ 22, 29).

Consistent with normal practice, Express Scripts agreed to pass along any rebates it received on drug purchases made by Plan members to the Plan. 2 App. 121 (Compl. ¶ 31). A summary plan description (or SPD)[1] submitted by MetLife in connection with briefing in the district court confirmed as much, stating:

### Rebates
The Plan Sponsor (MetLife) and Claims Administrators (Express

---

[1] SPDs are "statutorily required plan summaries (or summaries of plan modifications)" intended to "clear[ly]" and "simpl[y] communicat[e]" a plan's benefits to its members. *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011).

Scripts or Aetna) may receive rebates for certain drugs included on the Formulary. These rebates are not considered in calculating any Co-Payments or Coinsurance under the Plan. *The Plan Sponsor applies these rebates towards Plan expenses.*

2 App. 29 (MTD). (emphasis added). In other words, when Express Scripts received a rebate on a drug purchase made by a Plan member, the rebate would not be applied to offset any copayment or coinsurance owed by the individual member on that purchase, but would instead go to the Plan for "Plan expenses." *Id.*

### C.    MetLife Seizes Drug Rebates from the Plan and Passes the Plan's Losses on to Participants.

Between 2016 and 2022, Express Scripts collected $65,237,379 in rebates of amounts paid by the Plan and its members for prescription drugs. 2 App. 121 (Compl. ¶ 31). Express Scripts paid those sums to the Plan. *Id.* at 121 (Compl. ¶ 32). Once paid into the Plan's trust (or earmarked for that purpose), the drug rebates became Plan assets. *See, e.g.*, Department of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993) ("Plan assets manifestly include any property held in trust on behalf of the plan," including "all property held" in a trust "established on behalf of the Plan."). MetLife attested in the Plan's tax documents, under penalty of perjury, that the drug rebates Express Scripts collected were owed to the Plan itself and that they constituted "Net Assets Available for Benefits" no different from "participant contributions." 2 App. 121–122 (Compl. ¶ 32); 2 App. 134 (MTD Ex. 11).

6

As rebated Plan assets, ERISA required MetLife to use these amounts for the benefit of the Plan and its participants. For example, the U.S. Department of Labor has issued guidance explaining that when employers receive similar rebates from insurance companies that constitute "the health plan's assets," ERISA requires they "must be held in a trust" by the employer and used for the benefit of the plan and its participants "(such as distributing to participants, enhancing plan benefits or reducing future participant premiums)." U.S. Department of Labor, *Understanding Your Fiduciary Responsibilities Under a Group Health Plan* (Sept. 2019) at 4, https://tinyurl.com/yc5uc6sd. Ordinarily, "plan sponsors use [drug] rebates [from PBMs] to reduce the premiums beneficiaries pay for their drug coverage." U.S. Government Accountability Office, *CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending* (Sept. 2023) at 2, https://tinyurl.com/2wwczyk2; *see also* U.S. Government Accountability Office, *Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* at 2 (July 2019), https://tinyurl.com/3n8tfkbn (noting self-funded health plan sponsors use drug rebates from PBMs to "help[ ] control premiums for beneficiaries").

ERISA further prohibited MetLife from taking or using these funds for its own benefit beyond "reimbursement of expenses properly and actually incurred[ ] in the performance of . . . duties with the plan." 29 U.S.C. § 1108(c)(2). For example, ERISA's anti-inurement provisions require that "all assets of an employee benefit plan shall be held in trust by one or more trustees," and that "the

assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(a), (c)(1).

MetLife nonetheless transferred the drug rebates from the Plan to itself. 2 App. 121-122 (Compl. ¶¶ 31-33). It took these amounts for its own general corporate use, with no benefit to the Plan. *Id*. at 122 (Compl. ¶ 34). The drug rebates MetLife took were amounts over and above the fees MetLife charged the Plan for its administrative services, as well as ordinary Plan expenses (like paying Express Scripts), which the Plan paid directly. 2 App. 119-120, 122 (Compl. ¶¶ 29, 33). As MetLife acknowledged in briefing before the district court, rather than apply these amounts to the Plan expenses for which they were earmarked, MetLife used these amounts to "offset" *its own* expenses in funding the Plan. 2 App. 87, 91, 100 (MTD). In other words, MetLife used its fiduciary power over Plan assets to transfer millions of dollars from the Plan's trust to itself, claiming this to be justified by the fact that MetLife paid millions of dollars to fund the Plan's benefits in its capacity as the Plan's employer sponsor. But a plan sponsor cannot "claw back with [its] fiduciary hands compensation granted with [its] employer hands" in this manner. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 29 (1st Cir. 2018).

After taking the Plan's assets, MetLife passed the Plan's losses on to the Plan's members. As discussed above, MetLife calculates the required premium

8

payments for Plan members by applying a fixed formula to the cost of funding their health benefits, which accounts for any Plan assets available to fund those benefits. 2 App. 116, 120 (Compl. ¶¶ 20, 30). By illegally removing Plan assets and shrinking the funds available to cover the cost of health benefits, MetLife necessarily caused Plan participants (including Plaintiffs-Appellants) to pay higher premiums. *Id.*; *cf. Denton v. First Nat. Bank of Waco, Texas*, 765 F.2d 1295, 1298 n.5 (5th Cir. 1985) (explaining that in computing the amount required to fund employee benefits, "assumptions are made by actuaries as to . . . expected investment revenues[ ]" on plan assets, and the "expected investment return" reduces the anticipated cost of funding benefits); *Wachtell, Lipton, Rosen & Katz v. Comm'r*, 64 T.C.M. (CCH) 128 (T.C. 1992), *aff'd*, 26 F.3d 291 (2d Cir. 1994) (explaining that benefit plan assets come "from two sources: contributions . . . and earnings on the trust assets," and actuaries "predict the rate at which the trust will self-generate growth . . . along with all of the other actuarial assumptions to calculate the required contributions").

As a simplified illustration, imagine the anticipated cost of funding health benefits under the Plan is $100, and there is a $10 surplus of Plan assets available to fund those benefits. In this scenario, after applying the $10 of Plan assets, Plan members and MetLife would split the remaining cost of $90, with Plan members paying $27 dollars (30%) and MetLife paying $63 dollars (70%). *See* 2 App. 116-117 (Compl. ¶¶ 20-21). But if MetLife takes the $10 surplus for itself, MetLife and

Plan members split the full $100 cost, with Plan members now paying $30 (30%) and MetLife paying $70 (70%). In the latter scenario, MetLife pays $7 more, but because it has illegally taken $10 from the Plan, it comes out $3 ahead. Plan members, on the other hand, are forced to pay $3 more for the same benefits they would have received absent MetLife's fiduciary misconduct. MetLife has effectively taken $3 out of the pockets of Plan participants.

## II.    PROCEDURAL HISTORY.

Plaintiffs-Appellants filed suit against MetLife on January 25, 2023, bringing claims under ERISA sections 502(a)(2) and 502(a)(3). *See* 2 App. 113 (Compl.). MetLife moved to dismiss their complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on March 24, 2023. *See* 2 App. 15 (MTD). Plaintiffs-Appellants opposed the motion, *see* 2 App. 63 (Opp.), and MetLife replied in support. *See* 2 App. 147 (Reply).

The district court granted the motion to dismiss under Rule 12(b)(1) on July 18, 2023. *See* 1 App. 5 (Order). The court held that Plaintiffs-Appellants failed to allege an injury-in-fact for purposes of Article III standing. 1 App. 11-12 (Opinion). Having concluded that Plaintiffs-Appellants lacked standing, the district court declined to address MetLife's remaining arguments and dismissed Plaintiffs-Appellants' claims. *See id*. at 13; 1 App. 5 (Order). Plaintiffs-Appellants timely filed a notice of appeal on August 3, 2023. *See* 1 App. 2 (Notice of Appeal).

## SUMMARY OF THE ARGUMENT

MetLife illegally took over $65 million from a trust used to fund its employees' health benefits. To make up the resulting shortfall, MetLife (among other things) increased its employees' health insurance premiums. It thus caused the Plan's members, Plaintiffs-Appellants included, to pay more than they should have for health benefits. In short, Plaintiffs-Appellants lost money.

"Monetary harm is a classic form of injury-in-fact," such as where the plaintiff has been "forced to pay money it otherwise would have kept for itself." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005). The district court nonetheless concluded that Plaintiffs-Appellants had failed to plead an injury-in-fact for purposes of Article III standing. It provided three reasons.

First, the district court asserted that Plaintiffs-Appellants had suffered no injury because they had no personal "legal right to the general pool of Plan assets" from which MetLife took the $65 million at issue. 1 App. 11-12 (Opinion). But Plaintiffs-Appellants do not claim to have been injured by the bare diminution of the Plan's assets. Rather, they were injured when MetLife required them to make up the deficit and they personally lost money through higher out-of-pocket costs.

Second, the court asserted "excessive out-of-pocket costs" like those alleged by Plaintiffs-Appellants do not constitute "an individual injury" for purposes of Article III standing when a plaintiff brings an ERISA claim concerning "a defined benefit-type Plan." *Id*. at 12. But "[t]here is no ERISA exception to Article III,"

11

and ERISA claims require only "ordinary Article III standing analysis" that courts should not "make . . . more complicated than it needs to be." *Thole*, 140 S. Ct. at 1622. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Plaintiffs-Appellants' monetary loss here is no different.

Third, the district court labeled Plaintiffs-Appellants' financial loss "speculative and conclusory" without substantial analysis or explanation. 1 App. 12 (Opinion). The court supported this conclusion with a citation to a Plan document that it apparently read to rebut Plaintiffs-Appellants' claims, but which in reality supports them. *Id*. The district court further asserted that it is speculative whether the return of disgorged funds to the Plan would redress any plan members' injury. *Id*. In so holding, the district court ignored its broad discretion under ERISA "to fashion relief tailored to the unique circumstances of a case." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 102 (3d Cir. 2012). ERISA affords a wide array of remedies to make whole both the Plan *and* its current and former participants.

The district court reached the wrong conclusion in part because it applied the wrong legal framework. MetLife invited the district court to evaluate issues going to Plaintiffs-Appellants' (non-jurisdictional) statutory standing as if relevant to their (jurisdictional) Article III standing. The district court accepted MetLife's invitation and applied Rule 12(b)(1) where it should have applied Rule 12(b)(6).

This error in the district court's analysis independently merits reversal and remand. *See Potter v. Cozen & O'Connor*, 46 F.4th 148, 158 (3d Cir. 2022).

This Court has explained that, in ERISA cases, general allegations that "mismanagement of plan assets caused a loss to the plan that ultimately harmed [the plaintiff] and other plan participants" are sufficient to establish Article III standing "[a]t the pleadings stage," and "clearly qualif[y] as a concrete injury traceable to [the defendant] and redressable by a court." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007). Plaintiffs-Appellants have pled just that. MetLife illegally took money from Plaintiffs-Appellants' health plan, then passed the Plan's losses on to them through higher out-of-pocket costs. This paradigmatic financial injury is sufficient to establish Plaintiffs-Appellants' Article III standing in this case, just as it would be in any other.

## STANDARD OF REVIEW

On appeal from dismissal under Federal Rule of Civil Procedure 12(b)(1), the "standard of review . . . is de novo, accepting the facts alleged in the complaint as true and construing the complaint in the light most favorable to the non-moving party." *Potter*, 46 F.4th at 153.

## ARGUMENT

## I. PLAINTIFFS-APPELLANTS SATISFY THE INJURY-IN-FACT COMPONENT OF ARTICLE III STANDING.

Plaintiffs-Appellants allege a straightforward economic injury: MetLife took for itself over $65 million from a trust used to fund its employees' health benefits, then passed the Plan's losses on to Plan participants in the form of higher out-of-pocket costs. Having depleted the trust of money that otherwise would have funded health benefits under the Plan, MetLife made up the shortfall by causing Plaintiffs-Appellants and other Plan members to pay higher health-insurance premiums and to incur greater expenses than they would have absent this fiduciary misconduct. 2 App. 116-117, 123 (Compl. ¶¶ 20-21, 36-37).

The district court nonetheless concluded that Plaintiffs-Appellants did not allege a cognizable Article III injury. 1 App. 11-12 (Opinion). It offered three reasons. First, it asserted that Plaintiffs-Appellants had suffered no injury because they had no personal "legal right to the general pool of Plan assets" from which MetLife took the $65 million at issue. *Id*. Second, the court concluded that "excessive out-of-pocket costs" like those alleged by Plaintiffs-Appellants do not constitute "an individual injury" for purposes of Article III when a Plaintiff brings an ERISA claim concerning "a defined benefit-type Plan." *Id*. at 12. Third, the district court held that Plaintiffs-Appellants' financial loss was "speculative and

conclusory." *Id.* Plaintiffs-Appellants address each aspect of the court's reasoning in turn.

### A.    Plaintiffs-Appellants allege a personal financial loss, not a mere diminution of Plan assets in which they hold no interest.

The district court first observed that Plaintiffs-Appellants had no personal "legal right to the general pool of Plan assets" from which MetLife took the $65 million at issue. *Id.* at 11. It reasoned that self-funded health plans are "analogous to . . . defined benefit plan[s]" [2] in that they generally pay for benefits out of a pool of assets that belong to the plan itself, and "'typically hold[ ] no assets in trust for any individual participant.'" *Id.* (quoting *Smith v. Med. Benefit Administrators Grp.*, Inc., 639 F.3d 277, 283 (7th Cir. 2011)). Accordingly, "any asserted injury to the Plan" caused by MetLife's illegal removal of $65 million from the Plan's trust was "not an injury to [Plaintiffs-Appellants] themselves." *Id.* at 12.

This reasoning misapprehends Plaintiffs-Appellants' injury. Plaintiffs-Appellants do not assert that they were injured by mere "'diminution in plan assets, without more.'" *Id.* at 7 (quoting *Perelman v. Perelman*, 793 F.3d 368, 374 (3d Cir. 2015)). Rather, they were injured when MetLife required plan participants, Plaintiffs-Appellants included, to make up the Plan's losses through payment of

---

[2] "In a defined-benefit plan," such as a pension plan, "retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole*, 140 S. Ct. at 1618.

higher insurance premiums and (among other out-of-pocket expenses). In other words, Plaintiffs-Appellants were injured when they personally lost money.

This distinguishes the case at bar from those cited by the district court. For example, the district court relied heavily on *Thole v. U. S. Bank N.A.* In that case, the plaintiffs alleged the defendants had mismanaged the assets of a pension plan through which they received a fixed monthly sum. 140 S. Ct. at 1618. The plaintiffs had received all their past pension payments and concededly "ha[d] not sustained any monetary injury." *Id*. The plaintiffs likewise did not allege that the defendants' misconduct jeopardized or otherwise affected their *future* pension payments. *Id.* at 1621–22. Any injury the defendants caused the plan therefore did not affect the plaintiffs personally—they suffered no monetary harm, and win or lose, they would not receive "a penny more" or "a penny less." *Id*. at 1619. The Supreme Court thus held that, because the plaintiffs themselves lacked any "concrete stake in the lawsuit," they lacked constitutional standing. *Id*.

The second case cited by the district court, *Perelman v. Perelman*, closely tracks both the facts and analysis of *Thole*. Like *Thole*, the plaintiff in *Perelman* was a participant in a pension plan who alleged mismanagement of the plan's assets. 793 F.3d at 371–72. Also like in *Thole*, the plaintiff in *Perelman* conceded he had "received all distributions under the Plan to which he was entitled" and had not lost any money as a result of the defendants' mismanagement. *Id*. at 374. And as in *Thole*, the *Perelman* plaintiff failed to establish that the defendants' conduct

caused a material risk of future nonpayment. *Id.* at 375. Anticipating the Supreme

Court's holding in *Thole*, this Court held that the plaintiff in *Perelman* lacked

standing absent such a showing of "individualized harm." *Id.* at 374–75.

The contrast here is plain. Unlike the plaintiffs in *Thole* and *Perelman*,

Plaintiffs-Appellants allege they have personally lost money due to MetLife's

fiduciary misconduct. Should they prevail in this suit, they will recover that money

through relief that will make both the Plan *and* its current and former participants

whole, Plaintiffs-Appellants included. *See Donovan v. Bierwirth*, 754 F.2d 1049,

1056 (2d Cir. 1985) ("One appropriate remedy in cases of breach of fiduciary duty

is the restoration of the trust beneficiaries to the position they would have occupied

but for the breach of trust."). This is as concrete a stake as any litigant has in any

case. In short, Plaintiffs-Appellants have pled precisely what was missing in *Thole*

and *Perelman*: a specific "monetary injury" that they personally have suffered and

seek to remedy. *Thole,* 140 S. Ct. at 1618.

It bears noting that the pension plans at issue in *Thole* and *Perelman* differ in

significant respects from the self-funded health plan at issue here. Participants in a

pension plan accrue benefits over time through service to an employer, and those

benefits are fixed once earned. *See Thole*, 140 S. Ct. at 1618. The participant does

not pay to access his or her pension benefits, but receives them automatically once

qualified. *Thole* and *Perelman* thus recognize that depletion of a pension plan's

assets typically only causes a participant concrete economic harm when it results in

(1) nonpayment of pension installments or (2) a significant risk of default on future benefit payments. *See id.* at 1619, 1622; *Perelman*, 793 F.3d at 374–75.

As explained above, self-funded health plans work differently. Participants in a self-funded health plan pay for benefits on a monthly basis, with premiums and benefits that can fluctuate year-to-year. *See supra* pp. 2–5.[3] The amounts Plan participants pay in premiums and the quality of their benefits are tied to the amounts of the Plan's assets and costs. *Id.* Depleting a self-funded health plan's assets will therefore cause concrete economic harms to participants beyond nonpayment of benefits, such as by causing participants to pay higher premiums and other out-of-pocket costs, as was the case here.

B.    **The financial loss Plaintiffs-Appellants allege suffices to show an Article III injury in the ERISA context, just as in any other.**

Apparently recognizing Plaintiffs-Appellants' injury is not mere diminution of Plan assets, the district court went further. It held that "excessive out-of-pocket costs" do not, as a matter of law, constitute "an individual injury" for purposes of Article III standing where a plaintiff brings an ERISA claim concerning "a defined benefit-type Plan." 1 App. 12 (Opinion). The district court indicated that a plaintiff only suffers an injury cognizable under Article III in such cases when they allege

---

[3] The district court noted that health plans are superficially similar to pension plans in that "premiums and benefits" are "fixed" on a yearly basis and do not "fluctuate with the Plan's losses or profits" within a given year. 1 App. 11 (Opinion). But having made this observation, it made no effort to address the economic harms that may result to plan participants *from one year to the next*. The fact that MetLife may have illegally taken Plan assets in one year and passed the Plan's losses on to Plan participants in the next does not lessen Plaintiffs-Appellants' injury.

that they "did not receive their promised benefits." *Id.* But the district court did not explain its view that out-of-pocket monetary loss uniquely fails to satisfy Article III in this context.

As the Supreme Court has admonished, "[t]here is no ERISA exception to Article III," and ERISA requires only "ordinary Article III standing analysis" that courts should not "make . . . more complicated than it needs to be." *Thole*, 140 S. Ct. at 1622. "Monetary harm is a classic form of injury-in-fact," such as where a plaintiff is "forced to pay money it otherwise would have kept for itself." *Danvers*, 432 F.3d at 293. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski*, 580 U.S. at 464; *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). The monetary loss Plaintiffs-Appellants allege here is a classic financial injury for purposes of Article III standing. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 264 (3d Cir. 2009) (holding alleged increases to the plaintiffs' insurance premiums caused by unlawful conduct "constitute[d] a concrete injury in fact").

The district court did not cite any authority from this Court or the Supreme Court to support its assertion that "excessive out-of-pocket costs" uniquely fail to satisfy the injury requirement of Article III in the ERISA context. *See* 1 App. 12 (Opinion). And the authority it did cite does not support its conclusion. Rather, the cases cited by the district court generally concern instances in which plaintiffs did

not plead or were unable to plausibly allege the challenged misconduct caused

them to incur out-of-pocket losses.[4] If anything, these cases tacitly acknowledge

that plausible allegations of out-of-pocket losses suffice to establish a litigant's

standing in the ERISA context, just as they would with respect to any other type of

claim.

### C.    Plaintiffs have adequately alleged their financial injury.

"Injury-in-fact is not Mount Everest." *Danvers*, 432 F.3d at 294. A plaintiff

need not "definitively prove her injury or disprove the [defendant's] defenses" at

the pleading stage, but need only "plausibly plead[ ] on the face of her complaint

that she suffered financial harm from the [defendant's] action." *Tyler v. Hennepin

Cnty., Minnesota*, 598 U.S. 631, 637 (2023). To plead an Article III injury,

"general factual allegations of injury resulting from the defendant's conduct"

suffice, and courts must "'presum[e] that general allegations embrace those

specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 561 (1992) (citation omitted).

Plaintiffs-Appellants allege that MetLife required them to pay insurance

premiums (and other out-of-pocket costs) to fund their health benefits. 2 App. 116

---

[4] *See, e.g.*, *Loren v. Blue Cross & Blue Shield of Michigan*, 505 F.3d 598, 608–09 (6th Cir. 2007) (holding that where plaintiffs alleged their self-insured health plan had been charged inflated prices for medical services performed for *other* members covered by *other* segments of a large, multi-part health plan, the bare allegation that the plan sponsor "probably" passed those expenses on to the plaintiffs themselves in some form was "conjectural and hypothetical"); *Gonzalez de Fuente v. Preferred Home Care of New York, LLC*, No. 18-cv-06749, 2020 WL 5994957, at *2–3 (E.D.N.Y. Oct. 9, 2020) (holding plaintiffs who alleged no out-of-pocket loss but rather poor quality of benefits had not suffered a compensable injury).

(Compl. ¶ 20). MetLife set the amounts it required Plaintiffs-Appellants to pay by applying a fixed formula to the projected cost of funding their health benefits, accounting for any other Plan assets available to fund those benefits. *Id*. at 116 (Compl. ¶ 20), 2 App. 120 (Compl. ¶ 30). MetLife then illegally took Plan assets totaling $65,237,379 from the trust used to fund Plaintiffs-Appellants' health benefits between 2016 and 2022. 2 App. 121-122 (Compl. ¶¶ 31-33). Per the formula used to set premiums, depleting these Plan assets necessarily caused an increase in Plaintiffs-Appellants' premiums to make up the shortfall. 2 App. 116, 120 (Compl. ¶¶ 20, 30).

These are all "facts that are specific, plausible, and susceptible to proof at trial." *Finkelman v. Nat'l Football League*, 877 F.3d 504, 513 (3d Cir. 2017). Indeed, these allegations accord with normal actuarial principles. *Cf. Denton*, 765 F.2d at 1298 n.5; *Wachtell*, 64 T.C.M. (CCH) 128. They further accord with the ordinary practice among self-funded health plans that "plan sponsors use [drug] rebates [from PBMs] to reduce the premiums beneficiaries pay for their drug coverage." U.S. Government Accountability Office, *CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending*, *supra* at 2. It is eminently plausible that MetLife's removal of over $65 million from a trust used to fund Plaintiffs-Appellants' health benefits caused at least *some* increase in their health insurance premiums. And any increase at all would suffice to establish Plaintiffs-Appellants' standing. *Czyzewski*, 580 U.S. at 464. These allegations of

21

actual and historical fact require no speculation, but may be proven (or disproven) to a near-certainty through targeted discovery into MetLife's actuarial process.

The district court nonetheless labeled Plaintiffs' injury "speculative and conclusory" without explicitly addressing the plausibility of the allegations discussed above. *See* 1 App. 12 (Opinion). It instead (1) cited a Plan document MetLife argued precludes Plaintiffs-Appellants from claiming any right to recover the amounts at issue; and (2) asserted that any recovery here would be "deposited back into the Plan," and it is "conjecture" that this would result in any concrete benefits to Plan participants. *Id*.

As to the first, the court cited (without elaboration) the SPD discussed above, which again states:

> **Rebates**
> The Plan Sponsor (MetLife) and Claims Administrators (Express Scripts or Aetna) may receive rebates for certain drugs included on the Formulary. These rebates are not considered in calculating any Co-Payments or Coinsurance under the Plan. The Plan Sponsor applies these rebates towards Plan expenses.

1 App. 8 (Opinion). But this document has little bearing on Plaintiffs-Appellants' standing. It does not mention participant premiums or how they are calculated. It discusses only co-payments and coinsurance, which, as discussed above, are amounts that insureds pay to providers for drugs or medical services, and which are distinct from the premiums that insureds pay into their health plan for coverage. *See supra* pp. 3–4. Moreover, on its face, this document simply informs

22

insureds that any co-payment or coinsurance they owe for a given drug purchase will not be offset by any rebates paid on that drug purchase. It is unclear how this document can be read to refute Plaintiffs-Appellants' alleged injury, and the district court did not explain.

As to the second prong of the district court's reasoning, the court was wrong that it could not order meaningful relief in two ways. First, it is not "speculative" that any funds "deposited back into the Plan" will confer a concrete benefit on individual Plan members. 1 App. 12 (Opinion). Plaintiffs allege that MetLife uses a mathematical formula to calculate premiums that would, consistent with normal actuarial principles, take account of these funds in a manner that would result in lower required premium payments. 2 App. 116, 120 (Compl. ¶¶ 20, 30).

Second, the district court was incorrect in its assumption that any funds MetLife disgorges here must necessarily be "deposited back into the Plan." 1 App. 12 (Opinion). Courts enjoy broad discretion under ERISA "to fashion relief tailored to the unique circumstances of a case." *Iola*, 700 F.3d 65 at 102. There are numerous equitable remedies available under ERISA that would make the Plan's current and former members whole alongside the Plan.

For example, Plaintiffs-Appellants allege MetLife's unlawful conduct caused them and other Plan members to pay inflated premiums. 2 App. 120 (Compl. ¶ 30). "Several Courts of Appeals have held that the remedy of return of premiums" to plan members "is available under ERISA § 502(a)." *Menkes v.*

*Prudential Ins. Co. of Am.*, 762 F.3d 285, 296 n.11 (3d Cir. 2014). Additionally,

where a fiduciary enjoys unlawful profits at the expense of a plan's beneficiaries,

ERISA permits the beneficiaries to seek a constructive trust over those profits and

restitution of ill-gotten gains. *Iola*, 700 F.3d at 101; *see also Amalgamated*

*Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1419

(9th Cir. 1988) (holding that "ill-gotten profits held in a constructive trust for plan

participants and beneficiaries may be construed as equitably vested benefits under

an ERISA plan" to be distributed to members). Other remedies include a surcharge

on MetLife to recoup Plan members' losses. *See McCravy v. Metro. Life Ins. Co.*,

690 F.3d 176, 181–82 (4th Cir. 2012) (citing *CIGNA Corp.*, 563 U.S. at 441).

Any one of the foregoing remedies would redress Plaintiffs-Appellants'

injuries. The district court did not hold these remedies to be unavailable. Rather, it

did not address or acknowledge them at all. Indeed, it is doubtful that the district

court could appropriately rule on the availability of these remedies at the pleading

stage given that this would entail a fact-bound analysis that depends on "the unique

circumstances of a case." *Iola*, 700 F.3d at 102.[5] Moreover, "[i]n assessing a

plaintiff's Article III standing" under Rule 12(b)(1), courts "must 'assume that on

the merits the plaintiffs would be successful in their claims.'" *Am. Farm Bureau*

---

[5] It further bears noting that, because Plaintiffs-Appellants have standing, they may properly seek relief under ERISA that "'sweeps beyond [their] own injur[ies]'" to redress harms MetLife inflicted on other Plan members. *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009)).

*Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016) (quoting *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008)). For purposes of the analysis at issue, it was incumbent upon the district court to assume Plaintiffs-Appellants would establish their entitlement to the above remedies.

## II.   THE DISTRICT COURT CONFLATED CONSTITUTIONAL AND STATUTORY STANDING, WHICH INDEPENDENTLY MERITS REVERSAL AND REMAND.

The district court reached an incorrect conclusion regarding Plaintiffs-Appellants' Article III standing in part because it applied the wrong legal framework. At MetLife's invitation, the district court evaluated issues going to Plaintiffs-Appellants' (non-jurisdictional) *statutory* standing as if relevant to Plaintiffs-Appellants' (jurisdictional) *constitutional* standing. This presents independent grounds for the Court to reverse and remand. *See Potter*, 46 F.4th at 158 (reversing a district court that conflated prudential and Article III standing and remanding for the district court to perform the correct analysis).

Article III standing addresses "the constitutional power of a federal court to resolve a dispute," and requires only an injury that is traceable to the defendant and redressable by the court. *Graden*, 496 F.3d at 295. This analysis generally does not consider the merits of a claim or whether a plaintiff is entitled to the relief he or she seeks. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Statutory standing, on the other hand, is "statutory interpretation" that "asks . . . whether Congress has accorded [an] injured plaintiff

the right to sue the defendant to redress his injury" under a particular statute.

*Graden*, 496 F.3d at 295. In contrast to Article III standing, "statutory standing is

inherently non-jurisdictional" and goes to the merits of a plaintiff's claim, not a

court's ability to entertain it. *Wallach v. Eaton Corp.*, 837 F.3d 356, 364 n.9 (3d

Cir. 2016). A challenge to a plaintiff's statutory standing at the pleading stage thus

"should be brought by way of a 12(b)(6) motion" and "not by way of a 12(b)(1)

motion." *Id.*

MetLife argued in the district court that Plaintiffs-Appellants lack statutory

standing under ERISA because they seek "extracontractual" benefits. *See* 2 App.

32-33, 37-40 (MTD). MetLife further contended that the district court should

evaluate Plaintiffs-Appellants' statutory standing under Rule 12(b)(1) as an issue

going to the court's subject matter jurisdiction. *Id.* at 32-33, 37. The district court

adopted this framing. *See* 1 App. 8 (Opinion). It characterized whether Plaintiffs-

Appellants improperly seek "extracontractual benefits" under ERISA as

jurisdictional and thus applied Rule 12(b)(1). *Id.* And even as the court framed its

reasoning in terms of Article III standing, its analysis focused on *statutory*

standing: whether Plaintiffs-Appellants have a right under ERISA to the amounts

MetLife took and whether ERISA affords them a cause of action to recoup those

amounts. *See* 1 App. 10-12 (Opinion).[6]

---

[6] *See United States v. Catala*, 870 F.3d 6, 10 (1st Cir. 2017) (explaining that
whether a statute gives the plaintiff "a 'legal interest' in . . . the property" that the
plaintiff allegedly lost is a matter of statutory, not Article III, standing); *Am.*

The district court erred in analyzing these issues under Rule 12(b)(1) instead of Rule 12(b)(6). 1 App. 7 (Opinion). The difference is "significant," as "'[b]randing a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system.'" *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 122 (3d Cir. 2016) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). There are "myriad procedural differences" between Rules 12(b)(1) and 12(b)(6), not the least of which being "that the two rules invert the burden of persuasion, *i.e.*, the defendant bringing a Rule 12(b)(6) motion must show that the plaintiff has not stated a claim, but if it brings a Rule 12(b)(1) motion, it is the plaintiff's responsibility to show that the court has subject matter jurisdiction." *Potter*, 46 F.4th at 154–55. It is therefore reversable error where a district court conflates constitutional and statutory standing and thus incorrectly analyzes the latter under Rule 12(b)(1). *Id.* at 158.

By applying the wrong legal standard, the district court misallocated the burden of persuasion. *See* 1 App. 7 (Opinion). (placing the burden of persuasion on Plaintiffs-Appellants). This foundational error further confused the district court's

---

*Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (explaining that a plaintiff who alleges a "personal financial stake[ ] in the suit" may have Article III standing to bring an ERISA claim, even where ERISA does not afford statutory standing to recoup his or her losses); *Cole v. General Motors Corp.*, 484 F.3d 717, 722–23 (5th Cir. 2007) ("Whether recovery for such a claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264–65 (2d Cir. 2006) ("[A]n injury-in-fact differs from a 'legal interest'; an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law.").

legal analysis. *See supra* pp. 14–25.[7] This error in the district court's analysis is a

sufficient basis for this Court to reverse and remand, even without reaching the

outcome of the district court's analysis. *See Potter*, 46 F.4th at 158.

## CONCLUSION

The question of whether Plaintiffs-Appellants have pled an Article III injury

is neither difficult nor complex. Plaintiffs-Appellants allege MetLife's unlawful

conduct caused them to pay sums they otherwise would have kept for themselves,

"a classic form of injury-in-fact." *Danvers*, 432 F.3d at 293. They have alleged that

concrete monetary injury with "facts that are specific, plausible, and susceptible to

proof at trial." *Finkelman*, 877 F.3d at 513. And while Plaintiffs-Appellants lack

the means to plead the specifics of MetLife's actuarial process at the outset,

"ERISA plaintiffs generally lack the inside information necessary to make out their

claims in detail unless and until discovery commences," and so "[i]f plaintiffs

cannot state a claim without pleading facts which tend systemically to be in the

sole possession of defendants, the remedial scheme of the statute will fail, and the

crucial rights secured by ERISA will suffer." *Braden*, 588 F.3d at 598.

The burden on Plaintiffs-Appellants to prove their injury will increase as the

case progresses. *See Lujan*, 504 U.S. at 561. Plaintiffs-Appellants intend to meet

---

[7] Plaintiffs-Appellants note that, in conflating constitutional and statutory standing, the district court eschewed and did not mention authority holding that "former employees" like Plaintiffs-Appellants "are participants with [statutory] standing" under ERISA "when they sue for disgorgement of a plan fiduciary's ill-gotten profits," as Plaintiffs-Appellants do here. *Graden*, 496 F.3d at 299.

that burden with targeted discovery into MetLife's actuarial process. But at the outset, when this information is exclusively within MetLife's possession, the requirement to plead an injury-in-fact sets only a "low threshold." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citation omitted); *see also Danvers*, 432 F.3d at 294. Plaintiffs-Appellants clear that threshold and should be given the chance to prove their allegations. The Court should reverse and remand.

Date: October 16, 2023                    ENGSTROM LEE LLC

                                          */s/ Charlie C. Gokey*
                                          Charlie C. Gokey
                                          Engstrom Lee LLC
                                          729 N. Washington Avenue, Suite 600
                                          Minneapolis, MN 55401
                                          Telephone: (612) 305-8349
                                          cgokey@engstromlee.com

                                          *Attorney for Plaintiffs-Appellants*
                                          *Marla Knudsen, et al.*

**CERTIFICATE OF COMPLIANCE**

I.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 7,269 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

II.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021, in 14-point Times New Roman.

October 16, 2023                        /s/ *Charlie C. Gokey*
                                        Engstrom Lee LLC
                                        *Attorney for Plaintiffs-Appellants*
                                        *Marla Knudsen, et al.*

**ELECTRONIC DOCUMENT CERTIFICATE**

I, Charles C. Gokey, hereby certify that the text of the electronically filed

brief is identical to the text of the original copies that were served on October 16,

2023, by Federal Express Overnight delivery to the Clerk of the Court of the

United States Court of Appeals for the Third Circuit.

October 16, 2023                    /s/ *Charlie C. Gokey*
                                    Engstrom Lee LLC
                                    *Attorney for Plaintiffs-Appellants*
                                    *Marla Knudsen, et al.*

## CERTIFICATE OF BAR ADMISSION

Pursuant to LAR 46.1(e), the undersigned hereby certifies that he is counsel of record and is a member of the bar of the United States Court of Appeals for the Third Circuit.

October 16, 2023

/s/ *Charlie C. Gokey*
Engstrom Lee LLC
*Attorney for Plaintiffs-Appellants*
*Marla Knudsen, et al.*

## CERTIFICATE OF PERFORMANCE OF VIRUS CHECK

I, Charles C. Gokey, hereby certify that on October 16, 2023, I caused a

virus check to be performed on the electronically filed copy of this brief using the

following virus software: Microsoft Defender.  No virus was detected.

October 16, 2023                          /s/ *Charlie C. Gokey*
                                          Engstrom Lee LLC
                                          *Attorney for Plaintiffs-Appellants*
                                          *Marla Knudsen, et al.*

# CERTIFICATE OF SERVICE

I, Charles C. Gokey, hereby certify that on October 16, 2023, I caused seven

(7) copies of Appellants' Opening Brief to be served via Federal Express

Overnight delivery to the Clerk of the Court for the United States Court of Appeals

for the Third Circuit, and filed an electronic copy of the brief via CM/ECF.  I also

caused a copy of this brief to be served electronically on the following counsel for

Appellee:

James O. Fleckner
David Rosenberg
Goodwin Proctor LLP
100 Northern Ave.
Boston, MA 02210

Jamie A. Santos
Goodwin Proctor LLP
1900 N. Street, NW
Washington, DC 20036

October 16, 2023                    /s/ *Charlie C. Gokey*
                                    Engstrom Lee LLC
                                    *Attorney for Plaintiffs-Appellants*
                                    *Marla Knudsen, et al.*