No. 23-2420

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

MARLA KNUDSEN, et al.,
*Plaintiffs-Appellants*,

v.

METLIFE GROUP, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court for the District of New Jersey
Case No. 2:23-cv-00426-WJM-ESK
Hon. Judge William J. Martini

**BRIEF OF DEFENDANT-APPELLEE**

James O. Fleckner
David Rosenberg
Christopher J.C. Herbert
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
JFleckner@goodwinlaw.com
DRosenberg@goodwinlaw.com
CHerbert@goodwinlaw.com

Jaime A. Santos
**GOODWIN PROCTER LLP**
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
JSantos@goodwinlaw.com

*Counsel for Defendant-Appellee MetLife
Group, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Defendant-Appellee makes the following disclosure:

MetLife Group, Inc. is a wholly owned subsidiary of MetLife, Inc., which is a publicly traded corporation that does not have a parent corporation or any publicly held corporation owning ten percent (10%) or more of its stock.

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES........................................................4

STATEMENT OF RELATED CASES ..............................................4

STATEMENT OF THE CASE............................................................4

   I.  Employer-sponsored healthcare plans ............................................4

   II.  Plaintiffs receive the healthcare benefits they were promised under MetLife's self-funded plan and then sue, claiming that MetLife had mistreated plan assets. ....................................................................6

   III.  The district court dismisses Plaintiffs' complaint. .......................11

SUMMARY OF ARGUMENT ........................................................14

STANDARD OF REVIEW ..............................................................20

ARGUMENT ....................................................................................20

   I.  Plaintiffs did not plausibly plead an individualized and concrete injury based on an alleged depletion of a general pool of assets in which they had no equitable or property interests. ..........................................21

      A.  ERISA plaintiffs lack standing to challenge the alleged mismanagement of plan assets when their benefits are defined by their plans and the employer bears the financial risk of paying those benefits. ................................................................................22

      B.  Under these principles, Plaintiffs lack standing for their mismanagement-of-Plan-assets claims. .................................26

      C.  Plaintiffs' "shortfall" theory was not raised below and is unsupported by factual allegations. .......................................35

   II.  Plaintiffs' premium-inflation theory of harm was unsupported by well-pleaded factual allegations..............................................................38

      A.  Plaintiffs advance the wrong legal standard on appeal in an attempt to salvage their conclusory and speculative allegations........................38

      B.  Plaintiffs' allegations of economic harm rest on speculation rather than well-pleaded factual allegations clearly alleging injury in fact. ....42

   III.  The district court did not conflate constitutional and statutory standing. ....52

CONCLUSION ..................................................................................53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Associated Builders & Contractors W. Pennsylvania v. Cmty. Coll. of*
    *Allegheny Cnty.*,
    81 F.4th 279 (3d Cir. 2023) ................................................................34

*Bauer v. Mortg. Elec. Registration Sys., Inc.*,
    618 F. App'x 147 (3d Cir. 2015) .......................................................34

*Bozek v. PNC Bank*,
    No. 20-3515, 2021 WL 4240359 (3d Cir. Sept. 17, 2021)................41

*Cent. States SE & SW Areas Health & Welfare v. Merck-Medco*
    *Managed Care, LLC*,
    504 F.3d 229 (2d Cir. 2009) .......................................................26, 29

*DeGenes v. Murphy*,
    289 F. App'x 558 (3d Cir. 2008) .......................................................34

*Denton v. First Nat. Bank of Waco, Texas*,
    765 F.2d 1295 (5th Cir. 1985) ...........................................................45

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) .........................................................5, 29

*Duncan v. Muzyn*,
    885 F.3d 422 (6th Cir. 2018) .............................................................26

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
    725 F.3d 406 (3d Cir. 2013) ..............................................................25

*In re Express Scripts, Inc., PBM Litig.*,
    No. 4:05-MD-01672 SNL, 2008 WL 2952787 (E.D. Mo. July 30, 2008).........10

*Finkelman v. Nat'l Football League*,
    877 F.3d 504 (3d Cir. 2017) ..............................................................41
    810 F.3d 187 (3d Cir. 2016) ............................... 20, 34, 39, 40, 41, 51

*Frempong v. Nat'l City Bank of Indiana,*
    452 F. App'x 167 (3d Cir. 2011) ..........................................................34

*Glanton v. AdvancePCS Inc.,*
    465 F.3d 1123 (9th Cir. 2006) ............................................................44

*Gonzalez de Fuente v. Preferred Home Care of New York LLC,*
    858 F. App'x 432 (2d Cir. 2021) ..................................5, 16, 27, 28, 29

*Graden v. Conexant Sys. Inc.,*
    496 F.3d 291 (3d Cir. 2007) ...............................................................39

*Hein v. F.D.I.C.,*
    88 F.3d 210 (3d Cir. 1996) .................................................................25

*Horvath v. Keystone Health Plan East, Inc.,*
    333 F.3d 450 (3d Cir. 2003) ...............................................................43

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999) ...................................... 2, 5, 6, 23, 24, 26, 28, 29

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP,*
    634 F.3d 1352 (11th Cir. 2011) .....................................................49, 50

*J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.,*
    No. 1:01-CV-704, 2005 WL 1396940 (S.D. Ohio June 13, 2005).....................10

*Jacobs v. Verizon Commc'ns, Inc.,*
    No. 16 CIV. 1082 (PGG), 2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017).........34

*LaRue v. DeWolff, Boberg & Assocs., Inc.,*
    552 U.S. 248 (2008) ...........................................................................24

*Lee v. Verizon Commc'ns, Inc.,*
    837 F.3d 523 (5th Cir. 2016) ..............................................................25

*In re Lidoderm Antitrust Litig.,*
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017).............9

*Loren v. Blue Cross & Blue Shield of Mich.,*
    505 F.3d 598 (6th Cir. 2007) ...........................................26, 29, 43, 44

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................39

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
   898 F.3d 461 (5th Cir. 2018) .............................................4, 5, 26, 29

*Perelman v. Perelman*,
   793 F.3d 368 (3d Cir. 2015) ............................... 12, 16, 24, 25, 27, 28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass. 2005) ........................................................10

*Sampson v. Fed. Republic of Germany*,
   250 F.3d 1145 (7th Cir. 2001) ........................................................34

*Scott v. UnitedHealth Grp., Inc.*,
   540 F. Supp. 3d 857 (D. Minn. 2021)........................................5, 6, 16

*Smith v. Med. Benefit Adm'rs Grp., Inc.*,
   639 F.3d 277 (7th Cir. 2011) ...................................................5, 6, 16

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ........................................ 15, 19, 20, 34, 39, 41

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019) ...........................................................33

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020)...................... 3, 12, 16, 22, 23, 24, 27, 28, 34, 35, 51, 53

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
   980 F.3d 879 (3d Cir. 2020) .................................. 19, 20, 34, 40, 41, 43, 51, 52

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)..............................................................17, 35

*Univ. Spine Ctr. v. Aetna, Inc.*,
   774 F. App'x 60 (3d Cir. 2019) ........................................................53

*Wachtell, Lipton, Rosen & Katz v. Comm'r*,
   64 T.C.M. (CCH) 128 (T.C. 1992) ..................................................45

*Warth v. Seldin*,
  422 U.S. 490 (1975)............................................................20, 34

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
  62 F.4th 517 (9th Cir. 2023) ......................................26, 27, 28, 29, 44

*ZT Employment Servs., LLC v. Gallagher Benefit Servs., Inc.*,
  No. 3:19-cv-381, 2021 WL 1199579 (S.D. Tex. Mar. 30, 2021)................29, 49

**Statutes**

29 U.S.C. § 1103(a) (ERISA § 403(a))........................................................10

29 U.S.C. § 1103(c) (ERISA § 403(c))........................................................10

29 U.S.C. § 1104(a)(1)(A) (ERISA § 404(a)(1)(A)) ...............................................10

29 U.S.C. § 1104(a)(1)(B) (ERISA § 404(a)(1)(C)) ...............................................10

29 U.S.C. § 1104(a)(1)(B) (ERISA § 404(a)(1)(D)) ...............................................36

29 U.S.C. § 1106(a)(1)(D) (ERISA § 406(a)(1)(D)) ...............................................10

29 U.S.C. § 1106(b)(1) (ERISA § 406(b)(1))........................................................10

29 U.S.C. § 1106(b)(3) (ERISA § 406(b)(3) ........................................................10

**Rules**

Federal Rule of Civil Procedure 12(b)(1) .............................................11, 19, 20, 52

Federal Rule of Civil Procedure 12(b)(6) ......................................................11, 19

**Other Authorities**

Internatl Rev. Serv., *Defined Benefit Plan*,
  https://www.irs.gov/retirement-plans/defined-benefit-plan (last
  updated June 5, 2023) ............................................................31

Kate Ashford, *Understanding Defined Benefit Pension Plans*, Forbes
  (Dec. 15, 2022), https://www.forbes.com/advisor/retirement/what-
  is-a-defined-benefit-plan/......................................................31

PBGC, *A Predictable Secure Pension for Life* (Jan. 2000), https://www.pbgc.gov/documents/a_predictable_secure_pension_for_life.pdf ...................................................................................31

*Plan year*, HealthCare.gov, https://shorturl.at/agmKP (last visited Dec. 28, 2023)..........................................................................31

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019), https://www.dol. gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf./..............33

U.S. Dep't of Labor, *FAQs about Retirement Plans and ERISA*, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-compliance.pdf (last visited Dec. 22, 2023). .....................................................32

U.S. Gov't Accountability Office, *Medicare Part D: CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending* (Sep. 5, 2023), https://www.gao.gov/products/gao-23-105270..........................................................................46

U.S. Gov't Accountability Office, *Medicare Part D: Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* (July 2019), https://www.gao.gov/assets/gao-19-498.pdf...............46

**INTRODUCTION**

MetLife Group, Inc. established an annual self-funded healthcare plan for its employees—one that each year specified the medical benefits to which enrolled participants would be entitled and the contributions that employees would be responsible for (premiums, copays, deductibles, etc.) depending on their choice of coverage and their position/salary level within the company, if they elected to participate.  Aside from the prespecified participant contributions, MetLife was responsible for paying healthcare claims—no matter the economic condition of the company, no matter the health levels of participants (whether or not, say, a global pandemic resulted in massively increased medical expenses that year), and no matter the performance of investments that MetLife maintained to support its obligations to pay benefits under the plan.  And pay it did—MetLife spent hundreds of millions of dollars each year funding healthcare benefits for employees, eclipsing multiple times the contributions that employees choosing to participate were required to make.

Plaintiffs Marla Knudsen and William Dutra elected to participate in the plan, choosing which coverage options to elect based on the terms specified in plan documents.  They received all the benefits they were promised, and at the participant-contribution levels set forth in the plan.  After leaving the company, they then sued, claiming that MetLife had mismanaged plan assets by using prescription-

drug rebates received from a pharmacy-benefit manager that Plaintiffs claim were supposed to be held in trust and used for the benefit of the plan. Plaintiffs do not appear to dispute that the plan documents expressly require MetLife to use these rebates to pay "Plan expenses," or that MetLife used these rebates to pay healthcare claims that it, as the sponsor of a self-funded healthcare plan, was responsible for paying. But their complaint asserted that MetLife's use of these rebates "necessarily result[ed] in higher premiums" for participants because it "reduced the assets available to provide benefits." 2 App. 120 (¶30). And they contended that if MetLife had placed these rebates into the general pool of plan assets supporting the plan, these rebates "may have" been used to reduce or rebate participant contributions rather than to fund healthcare claims. 2 App. 123 (¶36).

The district court dismissed Plaintiffs' claims for lack of constitutional standing—and rightly so. It is well established that where plan participants' benefits are defined by the plan rather than tied to the size of the trust, and the employer sponsoring the plan bears the financial risk for providing the promised benefits no matter what, plan participants have no legal interest in the general pool of plan assets supporting the plan sponsor's provision of the benefits promised under the plan. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-440 (1999). Consequently, a participant in this type of plan lacks constitutional standing to challenge the alleged misuse of those assets absent well-pleaded allegations that they failed to receive the

2

benefits they were promised or that there is a substantial risk that the plan sponsor will be unable to pay the promised benefits. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621-1622 (2020). Where, instead, they have "received all" of the benefits they were promised, they "lack Article III standing." *Id.* at 1622.

That is precisely the case here. Plaintiffs' benefits were defined each year by the plan rather than tied to the size of plan assets, and MetLife as plan sponsor bore the financial responsibility to pay healthcare claims incurred, irrespective of whether the claims activity, investment performance, or market conditions that year were as expected. Because Plaintiffs have no legal interest in the general trust of plan assets they alleged was mismanaged, and they did not offer any allegations that they failed to receive the benefits they were promised, the district court correctly held that they lack Article III standing to bring their claims. Moreover, while they contend that their theory here is different than one simply alleging a diminution of general plan assets because they allege "inflated premiums" caused by a violation of ERISA, the district court correctly rejected this theory on the pleadings. As the court observed, Plaintiffs' allegations were conclusory and speculative on their face: the complaint speculated about whether plan participants "may have" been in a better position had MetLife placed prescription-drug rebates into the general body of plan assets rather than using those rebates to pay healthcare claims, but these types of "may have" allegations are insufficient to clearly allege an actual and concrete injury in fact.

And Plaintiffs' effort to reframe their complaint on appeal is not supported by the allegations they asserted below.

Plaintiffs' brief simply identifies no error made by the district court. This Court should affirm.

## STATEMENT OF THE ISSUES

Whether the district court correctly held that Plaintiffs failed to allege an Article III injury in fact, where Plaintiffs did not allege that they were denied any of the healthcare benefits that their plan promised and their assertions of "inflated premiums" were based on speculation rather than on well-pleaded facts. These issues were raised in MetLife's motion to dismiss, 2 App. 33-37, and reply, 2 App. 153-156, and were decided by the district court, 1 App. 8-13.

## STATEMENT OF RELATED CASES

This Court has not previously addressed this case, and MetLife is unaware of any related case decided or pending before this Court or any other.

## STATEMENT OF THE CASE

### I.    Employer-sponsored healthcare plans

Employer-sponsored healthcare plans come in two general varieties: "fully insured" plans and "self-funded" plans. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 468 (5th Cir. 2018). Either type of plan can be funded by contributions from the employer, the employee, or both, but as Plaintiffs'

complaint explains, in self-funded plans the "employer is responsible for paying claims and bearing the financial risk" of doing so. *Id.*; *accord Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 658 (9th Cir. 2019); 2 App. 116 (¶19). Accordingly, if claims are higher than expected or the performance of any investments that support the payment of claims is lower than anticipated, the plan sponsor is responsible for paying the difference.

In fully insured plans, by contrast, "covered healthcare expenses are paid by an insurer under the terms of an insurance contract purchased by the plan," *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 859 (D. Minn. 2021), and the insurer "guarantees a fixed monthly premium for 12 months and bears the financial risk of paying claims," *N. Cypress*, 898 F.3d at 468; *accord Depot*, 915 F.3d at 659.

Both types of healthcare plans have been analogized to "defined-benefit plans" under ERISA. *See, e.g.*, *Scott*, 540 F. Supp. 3d at 864; *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011); *Gonzalez de Fuente v. Preferred Home Care of New York LLC*, 858 F. App'x 432, 434 (2d Cir. 2021). A "defined-benefit" plan, sometimes colloquially known as a traditional pension plan, is one (a) that consists of a pool of assets that may be funded by employer contributions, employee contributions, or both; and (b) in which the amount of an employee's benefits are specifically defined by the terms of the plan itself. *See Hughes*, 525 U.S. at 439-440. And while those assets are invested to pay the

5

promised benefits, the amount of benefits received by participants is not tied to the actual investment returns. Instead, the risk is "borne by the employer," which must pay the benefits promised in (*i.e.*, fixed by) the plan irrespective of investment performance. *Id.* at 440-441. In contrast, "defined-contribution" plans are plans in which employees and employers may both contribute, but "the employer's contribution is fixed," the employee invests the contributed funds through an individual investment account, and "the employee receives whatever level of benefits" results from those investment earnings. *Id.* at 439.

Given these characteristics, the self-funded healthcare/defined-benefit analogy is fairly obvious. In both self-funded healthcare plans and defined-benefit plans, the employer and plan define the level of contributions (if any) the employee must make in order to participate, the plan defines the benefits that the employee will receive, and the employer bears the risk of providing those benefits, irrespective of how external forces (like investment earnings or healthcare costs) might impact how much money the employer will ultimately be responsible for contributing. *See Smith*, 639 F.3d at 283; *Scott*, 540 F. Supp. 3d at 864.

## II. Plaintiffs receive the healthcare benefits they were promised under MetLife's self-funded plan and then sue, claiming that MetLife had mistreated plan assets.

Plaintiffs are two former participants in the MetLife Options & Choices Plan (the "Plan"), which is an omnibus or "wrap" plan that consists of several constituent

plans providing benefits to different segments of MetLife's current and former employee population. 2 App. 26, 115-116 (¶¶13-15, 17). The Plan provides healthcare benefits, including prescription-drug coverage, to eligible active, disabled, and retired MetLife employees and participating affiliates. 2 App. 116 (¶15). Participation in the Plan is entirely optional: employees are not required to elect any coverage at all. 2 App. 26, 116 (¶¶16-18). And those who do elect coverage have a variety of coverage options available to them (*e.g.*, Point of Service, Preferred Provider Organization, and High Deductible Health Plan options), including coverage options for a spouse and dependent children. 2 App. 115, 117 (¶¶13-14, 17-18).

The Plan requires employees who elect coverage to make contributions, which the Plan sponsor (MetLife) establishes each year and which vary depending on the coverage type chosen and the employee's job title/pay band. 2 App. 115, 116-117 (¶¶13-14, 20). Because the Plan is self-funded, however, MetLife is ultimately responsible for paying all healthcare claims and fees to service providers and therefore bears the financial risk of doing so.[1] 2 App. 116 (¶19). MetLife bears this

---

[1] Plaintiffs contend (at 3) that all of the Plan's health benefits are paid out of a trust funded by employee and employer contributions, citing paragraph 19 of the complaint. But paragraph 19 does not actually say that—it simply says that in self-funded plans, "benefits are paid by a trust holding plan assets *or by the employer*." 2 App. 116 (¶19) (emphasis added). And the Plan documents and MetLife's contract with its pharmacy-benefit manager all make clear that MetLife in part pays claims directly, from its own "general assets" rather than from segregated trust assets. *E.g.*,

burden using a variety of sources, including employer contributions and earnings from investments, which MetLife maintains to pay the benefits promised by the Plan. 2 App. 143.

The complaint alleges that to set employee contribution levels each year, MetLife estimates the overall cost of coverage for each medical benefit option, and reduces that figure to a per-person premium. 2 App. 116-117 (¶20). Then, participants who choose spousal or dependent coverage must contribute through monthly payroll deductions a portion of that premium based on the coverage type and job title/pay band formula used by the company. *Id.* The remaining costs of coverage are paid by MetLife. *Id.*

As the complaint alleges, employee contributions have generally accounted for "around 30%" of overall contributions to the Plan. 2 App. 117 (¶21). For example, according to the Plan's 2021 Form 5500 filing with the U.S. Department of Labor, of the nearly $342 million in contributions toward healthcare benefits in 2021, 26.6% (about $91 million) came from participant contributions, 68.6% (about $235 million) came from MetLife, and 4.7% (about $16 million) came from investment earnings. 2 App. 143.

---

Supp. App. 15, 235. As the complaint recognizes, this is a common feature of self-funded plans given that those plans' sponsors are ultimately responsible for paying all benefits promised, irrespective of whether employee contributions and investment earnings are sufficient to fund those benefits. 2 App. 116 (¶19).

As noted above, Plaintiffs are two former MetLife employees who elected to participate in the Plan and obtained medical and prescription-drug coverage for themselves and their immediate family members.  2 App. 115 (¶¶13-14).  They paid the premiums ($400 for Ms. Knudsen and $500 for Mr. Dutra) set by MetLife based on their chosen coverage options and position in the company, along with the applicable deductibles, copays, and coinsurance established in the Plan.  *Id.*

After leaving the company, Plaintiffs sued MetLife on behalf of more than 30,000 Plan participants and beneficiaries, alleging that MetLife violated ERISA in the way it managed Plan assets.  2 App. 125 (¶¶43-44).  Plaintiffs did not allege that they did not receive the benefits they were promised or that MetLife lacked the money to pay the claims they (or any other participant) submitted.  Instead, they alleged that MetLife improperly retained drug rebates paid by Express Scripts, Inc., the Plan's pharmacy benefit manager ("PBM").  2 App. 113 (¶3).

As the complaint explains, "[i]t is common for PBMs to negotiate volume discounts and rebates with drug manufacturers."  2 App. 119 (¶27).  PBMs often pass these rebates on to "health plans or plan sponsors depending on how their contracts are structured, and can be a percentage of the rebate received by the PBM from the drug manufacturer or a fixed dollar rebate per prescription."  *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *6

(N.D. Cal. Feb. 21, 2017); *see also In re Express Scripts, Inc., PBM Litig.*, No. 4:05-MD-01672 SNL, 2008 WL 2952787, at *5 (E.D. Mo. July 30, 2008).[2]

That is precisely what occurred here. 1 App. 7. MetLife's contract with Express Scripts provides that "ESI will pay to Sponsor"—*i.e.*, MetLife—"100% of the Rebates received by ESI" or specified "guaranteed amounts" for particular claims, depending on MetLife's "Plan design conditions." Supp. App. 240. And Plan documents specified precisely where those rebates would go: "The Plan Sponsor applies these rebates toward Plan expenses"—expenses that reached hundreds of millions of dollars per year in light of the size of the Plan and the many, many healthcare claims MetLife was responsible for paying. 1 App. 8; Supp. App. 220.

Plaintiffs' complaint asserted that MetLife's retention of these rebates violated ERISA[3] and caused them harm by "necessarily" increasing the premiums

---

[2] This is not the only way rebates arise: "Employers may also contract directly with manufacturers for the provision of rebates." *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 73 n.14 (D. Mass. 2005). Either way, though, the point is that the plan sponsor's receipt of rebates "lower[s] the sponsor's cost of providing the benefit." *J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.*, No. 1:01-CV-704, 2005 WL 1396940, at *9 (S.D. Ohio June 13, 2005).

[3] Specifically, Plaintiffs alleged that MetLife violated ERISA's trust and anti-inurement provisions, ERISA § 403(a) and (c), 29 U.S.C. § 1103(a) and (c); prohibited-transaction provisions, ERISA § 406(a)(1)(D), (b)(1), and (b)(3), 29 U.S.C. § 1106(a)(1)(D), (b)(1), and (b)(3); and fiduciary duties of prudence and loyalty, ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B). 2 App. 122-123 (¶35).

that Plan participants paid.  2 App. 120 (¶30).  Plaintiffs alleged that had MetLife

not retained those rebates and instead allocated them to the Plan's general pool of

assets held in trust to pay benefits, there might have been a variety of different

outcomes.  Specifically, MetLife "may have" been able to reduce its "ongoing

contributions," "consistent with its fiduciary duties"; it "may have … reduced co-

pays and co-insurance" paid by participants; or it "may have distributed rebates to

participants in proportion to their contributions to the Plan."  2 App. 123 (¶36); 1

App. 7, 12.  Because, in their view, they did not receive direct pecuniary benefits

from the prescription-drug rebates that MetLife received, Plaintiffs asserted that

their "cost of coverage, co-pays, and/or co-insurance" was "excessive," 2 App. 123

(¶37), and that the rebates MetLife received should be allocated to the Plan, 2 App.

130.

## III.    The district court dismisses Plaintiffs' complaint.

MetLife moved to dismiss Plaintiffs' complaint under both Rule 12(b)(1) and

Rule 12(b)(6) for lack of constitutional standing, lack of statutory standing, and

failure to state a claim.  1 App. 7.  The district court granted MetLife's Rule "12(b)(1)

motion to dismiss for lack of Article III standing" but denied MetLife's Rule

"12(b)(6) motion to dismiss for lack of statutory standing and for failure to state a

claim" as "moot."  1 App. 13.

In its opinion, the district court first acknowledged that, under binding precedent from both the Supreme Court and from this Court, Plaintiffs were required to allege an injury individualized to them, rather than allege "injuries to the plan." 1 App. 9-10 (citing *Thole*, 140 S. Ct. at 1620; *Perelman v. Perelman*, 793 F.3d 368, 375-376 (3d Cir. 2015)).

To determine whether Plaintiffs alleged an "individualized" injury, the district court analyzed whether the Plan was a type of defined-benefit plan (like a traditional pension plan) or a defined-contribution plan (like a 401(k)-type plan). 1 App. 10-11. In a defined-benefit plan, "which is more in the nature of a contract," "losses to the plan assets do not constitute injuries to the plan participants," since the employer is obligated to "make up any shortfall." 1 App. 10. As a result, individual plan participants do not have any ownership rights over the plan's general asset pool—only to the benefits specified in the plan that they are legally entitled to receive. *Id.* By contrast, in a defined-contribution plan, "the retirees' benefits are typically tied to the value of their accounts," and therefore mismanagement resulting in depleted plan assets can cause individual participants to suffer individual harm. 1 App. 11.

The district court joined the numerous other courts that have concluded that a self-funded healthcare plan is "analogous to a defined benefit plan." 1 App. 11. As the court recognized, just like a defined-benefit plan, the Plan here guarantees

specified benefits and MetLife as Plan sponsor bears the financial risk of providing those benefits.  *Id.*

Consequently, just as participants in a defined-benefit plan have no legally protected interest in the general pool of defined-benefit plan assets, the district court held that Plaintiffs here "have no legal right to the general pool of Plan assets" that they claimed MetLife mismanaged through the allegedly improper receipt of prescription-drug rebates.  *Id*.  And an injury to that asset pool, the court held, was an "injury to the plan," and "not an injury to Plaintiffs," whose only legally protected interest is receiving the benefits they were promised.  1 App. 12.  As the district court observed, the Plaintiffs did not contend that they failed to receive the benefits specified in the Plan.  *Id.*  Instead, their grievance was that the benefits they received, while precisely what they were promised, were insufficient: their premiums, deductibles, co-payments, or co-insurance contributions were higher than they could have been if MetLife had allocated the drug rebates to the general pool of trust assets. *Id.*  But because participants in this type of defined-benefit plan have no legally protected interest in the plan's general asset pool, the failure to receive *more* of that asset pool "is not an individual injury."  *Id.*

Finally, the district court rejected the Plaintiffs' argument that they could establish injury because the alleged misconduct resulted in higher premiums, deductibles, or other participant out-of-pocket costs.  *Id.*  As the court explained, this

theory was "speculative and conclusory," because the complaint failed to allege "any facts to show that the purported violations of ERISA caused Plan participants to incur higher out-of-pocket costs or deprived them of distributions that they otherwise would have received." *Id.* Indeed, Plaintiffs' own allegations were on their face expressly speculative—asserting that if MetLife had not violated ERISA, it "may" have used rebates to reduce co-pays or co-insurance or "may" have refunded Plan participants, *id.*, in an amount "proportion[ate] to their contributions to the Plan," 2 App. 123 (¶36).

Because the district court dismissed Plaintiffs' complaint for lack of Article III standing, it then "denied as moot" MetLife's motion to dismiss based on statutory standing and the complaint's failure to state a claim. 1 App. 13.

## SUMMARY OF ARGUMENT

The district correctly dismissed Plaintiffs' complaint for lack of Article III standing because Plaintiffs did not plausibly allege any invasion of their legally protected interest from MetLife's alleged retention of prescription-drug rebates. To the contrary, Plaintiffs alleged at most a diminution in the general pool of assets that supports the healthcare benefits that MetLife as Plan sponsor promises to Plan participants—benefits that Plaintiffs do not allege they failed to receive. Plaintiffs' "shortfall" theory of injury—the notion that MetLife created a "shortfall" in Plan assets and required participants to "make up the deficit" by "increas[ing] its

employees' health insurance premiums" (Opening Br. 11)—does not appear in the complaint and was not raised below. And the district court correctly concluded that Plaintiffs' increased-premium theory was not supported by "clearly … allege[d] facts demonstrating" injury in fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (ellipsis in original).

I.    The alleged diminution of Plan assets by MetLife does not establish that Plaintiffs experienced any actual and individualized injury in fact. Self-funded healthcare plans are, at their core, defined-benefit plans. This is primarily because benefits under both types of plans are "fixed." But it is also because the funding mechanisms and risk allocations of self-funded healthcare plans and defined-benefit plans are the same. In both situations, the plan sponsor bears the risk of paying out the promised benefits, regardless of predictions made at the time the benefits were promised, such as the accuracy of the predicted life expectancy of participants promised pension benefits for life, whether healthcare claims vastly exceeded predictions due to an unexpected worldwide pandemic (or any other reason), or whether investment returns intended to support the provision of promised benefits suffered from unanticipated market forces.

In defined-benefit plans, no individual participant has any legally protected ownership interest in the general pool of assets supporting the plan, and so an alleged "diminution in plan assets … is insufficient to establish actual injury to any

particular participant." *Perelman*, 793 F.3d at 374. To have Article III standing, then, defined-benefit plan participants must make some other "showing of individualized harm." *Id.* But as the Supreme Court has held, they cannot satisfy this burden if, despite alleged plan mismanagement, they do not claim to have been denied the "fixed" benefits included in their plans. *Thole*, 140 S. Ct. at 1619.

These principles apply equally in the self-funded healthcare plan context. *Scott*, 540 F. Supp. 3d at 864; *Smith*, 639 F.3d at 283; *Gonzalez de Fuente*, 858 F. App'x at 434. And here, they bar Plaintiffs' claims. Plaintiffs had no legally protected interest in the general pool of assets that they alleged MetLife mismanaged, and they did not contend that they failed to receive the benefits they were promised. Thus, they did not plead any individualized injury in fact from MetLife's use of prescription-drug rebates to pay the healthcare claims for which MetLife bore the financial risk.

In an attempt to avoid this case law, Plaintiffs argue on appeal that MetLife "depleted" the Plan assets, created a "shortfall," and then required Plan participants to "make up" the shortfall by "forc[ing]" them to replace "the Plan's losses" by increasing their healthcare premiums. Opening Br. 1, 11, 14. This "shortfall" theory does not appear in the complaint, nor did Plaintiffs argue it in opposing MetLife's motion to dismiss. The complaint does not point to any year in which MetLife lacked adequate funds to pay out all promised benefits, nor any increases in

Plaintiffs' premiums. To the contrary, Plaintiffs alleged that their premiums remained constant throughout the class period—about $400 for Ms. Knudsen and about $500 for Mr. Dutra.

At bottom, as the district court correctly recognized, Plaintiffs' contention of "excessive" costs in the context of a defined-benefit-type healthcare plan makes no sense. At best, it is simply a disagreement with the disclosed level of benefits a plan sponsor might voluntarily choose to provide. But not receiving monetary benefits that a plaintiff is not promised and has no legally protected interest in receiving is not a constitutionally cognizable injury in fact. And while Plaintiffs contend that "ERISA affords a wide array of remedies" in the event of an alleged statutory violation (Opening Br. 12), it is well established that the existence of monetary remedies is insufficient to satisfy Article III where a plaintiff cannot establish constitutionally cognizable injury in fact. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021).

II.    The district court also correctly rejected Plaintiffs' contention that it could establish standing through a premium-inflation theory of harm—the theory that MetLife's receipt of prescription-drug rebates inherently resulted in higher premiums or out-of-pocket costs than Plan participants "may have" otherwise paid. 2 App. 123 (¶¶36-37); 2 App. 78-79. The district court was correct to reject this theory as conclusory and speculative. Despite how Plaintiffs now attempt to

characterize their complaint, it contained no well-pleaded factual allegations that MetLife determined participant premiums based on the amount of assets in the general pool of alleged trust assets, or that MetLife's use of prescription-drug rebates actually caused higher premiums.

The only portions of the complaint Plaintiffs point to on appeal as supporting their premium-inflation theory are paragraphs 20 and 30. *See, e.g.*, Opening Br. 21. But paragraph 20 simply describes the process through which MetLife purportedly funds the Plan, without any allegations that participant contributions are based on the size of the general pool of plan assets. It then cites two cases as purportedly stating that employees' premium contributions are "determined based on the cost of 'projected medical claims.'" 2 App. 116-117 (¶20) (citations omitted). But these are not factual allegations, nor do these cases actually say this. And even if they did, Plaintiffs' complaint does not allege that the premium rates MetLife set here *did not already take into account* the totality of the circumstances, including prescription-drug rebates, in evaluating the projected costs of medical claims. Thus, paragraph 20 does nothing to factually support Plaintiffs' standing.

Nor does paragraph 30 help Plaintiffs. That paragraph offers legal arguments that prescription-drug rebates qualify as "plan assets" and then breezily states that MetLife's use of them "reduced the assets available to provide benefits, necessarily resulting in higher premiums"—an assertion supported solely by a citation to

paragraph 20, which of course contains no factual allegations to support it. Nor does this unsupported assertion make any sense in the context of a self-funded plan where, as courts have consistently recognized (and as the Plan here expressly provides), the employer sponsoring the plan bears the ultimate financial risk of paying out all healthcare claims.

And that is it—the entirety of the allegations Plaintiffs offer to satisfy their burden of "clearly … alleg[ing] facts demonstrating" injury in fact. *Spokeo*, 578 U.S. at 338. The district court made no error in holding that Plaintiffs lack standing.

III.    The district court did not conflate statutory and Article III standing or improperly analyze statutory standing under Rule 12(b)(1). This is clear from even a brief skim of the court's decision. The court addressed constitutional standing in a section titled "Article III Standing Analysis," citing cases likewise addressing constitutional standing, and it correctly did so under Rule 12(b)(1). 1 App. 8-13; *see Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) ("Constitutional standing … is properly tested under Rule 12(b)(1) …."). It then expressly "denied as moot" MetLife's "motion to dismiss for lack of statutory standing." 1 App. 13. To the extent Plaintiffs argue that it was improper for the court to consider that Plaintiffs were seeking "extracontractual benefits," the Supreme Court's decision in *Thole* says otherwise.

## STANDARD OF REVIEW

"The Court's review of a decision dismissing a complaint is plenary." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 192 (3d Cir. 2016) (*Finkelman I*). "Constitutional standing … is properly tested under Rule 12(b)(1)." *Thorne*, 980 F.3d 879 at 885. "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

## ARGUMENT

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. This case is about the first element of standing—injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (citation omitted). "To be 'concrete,' an injury must be 'real, or distinct and palpable, as opposed to merely abstract.'" *Finkelman I*, 810 F.3d at 193 (citation omitted). And "to be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.'" *Id.* (citation omitted).

The district court correctly concluded that Plaintiffs' complaint did not satisfy these constitutional prerequisites. Plaintiffs contend that MetLife mismanaged the general pool of assets supporting the payment of healthcare benefits—but those benefits are specifically defined in the Plan and Plaintiffs do not allege that MetLife failed to provide them. They have no legally protected interest in the general pool of assets and thus any reduction in that pool, even one resulting from an alleged statutory violation, cannot give rise to an actual, concrete, and individualized injury in fact. And Plaintiffs' attempts to distinguish this case from the many defined-benefit cases rejecting theories of injury based on an alleged "shortfall" or premium inflation—including those involving self-funded healthcare plans—are unpersuasive. As the district court correctly concluded, Plaintiffs' complaint lacked any plausible, non-conclusory, and non-speculative allegations of economic injury.

I.  **Plaintiffs did not plausibly plead an individualized and concrete injury based on an alleged depletion of a general pool of assets in which they had no equitable or property interests.**

Plaintiffs' fundamental contention is that MetLife mismanaged Plan assets through the way in which it allegedly used prescription-drug rebates. Opening Br. 1, 8. But as courts have repeatedly held, ERISA plan participants do not have standing to sue for the alleged mismanagement of plan assets when their benefits are specifically defined by their plans (rather than dependent upon the size or performance of any trust) and they do not allege that they failed to receive the

benefits they were promised. That reasoning applies equally in the context of a self-funded healthcare plan, where the annual benefits and participant contributions are defined at the outset and the employer bears the risk of providing those benefits irrespective of whether claim estimates and investment-income projections were high, low, or just right.

### A. ERISA plaintiffs lack standing to challenge the alleged mismanagement of plan assets when their benefits are defined by their plans and the employer bears the financial risk of paying those benefits.

It is crystal clear under Supreme Court and Third Circuit precedents that ERISA plaintiffs lack standing to challenge the alleged mismanagement of plan assets in the context of a defined-benefit plan where they received all of the benefits they were promised and cannot credibly allege that "the mismanagement of the plan was so egregious that it substantially increased the risk that" the plan sponsor would be unable to pay all promised benefits. *Thole*, 140 S. Ct. at 1621. This holding is based on the unique structural characteristics of defined-benefit plans, which strongly incentivize employers "to root out fiduciary misconduct" and also insulate participants from the financial consequences of plan mismanagement. *Id.*

Unlike defined-contribution plans, where employees each have their own individual investment account "and the[ir] benefits can turn on the plan fiduciaries' particular investment decisions," participants' benefits in defined-benefit plans are defined and fixed by the terms of the plan—they are not tied to the size of any trust

assets. *Thole*, 140 S. Ct. at 1618. In defined-benefit plans, there is "a general pool of assets" "funded by employer or employee contributions, or a combination of both." *Hughes*, 525 U.S. at 439. Those assets support the employer's payment of benefits—the employer makes contributions and fiduciaries make investment decisions based on estimates about what is needed to pay out anticipated retirement benefits. *Id.* at 436. But the benefits employees receive are defined by the plan document (the promises plan sponsors make about the benefits they will provide)—they are not tied to the size of the plan's assets, its investment performance, or the accuracy of the projections underlying contribution and investment decisions.

Employers offering defined-benefit plans thus "typically bear[] the entire investment risk." *Hughes*, 525 U.S. at 439. If the investments underperform, the employer has to "make up any shortfall" by increasing its own contributions; if the asset pool outperforms, resulting in a surplus of available funding, the plan participants have no right to that surplus—the plan sponsor can use it to cover its own plan-related obligations such as reducing or suspending its own contributions. *Id.* at 439-441, 445.

As the Supreme Court explained in *Thole*, these qualities are of "decisive importance" with respect to Article III standing when ERISA plaintiffs are challenging mismanagement of the plan's assets. 140 S. Ct. at 1618. Given the structure of defined-benefit plans, participants in these types of plans have no "claim

23

to any particular asset that composes a part of the plan's general asset pool" and therefore "no equitable or property interest in the plan." *Id.* at 1628. Because "a defined-benefit plan is more in the nature of a contract" in terms of the specific benefits participants can expect to receive, their legally protected interest is receiving the benefits they were promised in the plan. *Id.* at 1620. As a result, "[i]n the case of a defined benefit plan … diminution in plan assets, without more, is insufficient to establish actual injury to any particular participant." *Perelman*, 793 F.3d at 374 (citing *Hughes*, 525 U.S. at 439-441).

Thus, "even if … defendants' dealings result[] in a diminution in [p]lan assets," plaintiffs must make "a showing of individualized harm" to have Article III standing. *Perelman*, 793 F.3d at 374. For example: a well-pleaded allegation that the plaintiffs did not receive the benefits they were promised or, perhaps, that the plan mismanagement was "so egregious" that there was a substantial likelihood the employer would not be able to absorb the shortfall and thus "be unable to pay" the promised benefits. *Thole*, 140 S. Ct. at 1619, 1621; *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008) ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan"). But without that type of allegation, defined-benefit plan participants alleging plan mismanagement

are simply seeking to enforce an alleged statutory violation resulting in no individualized injury—something that Article III prohibits.

While *Thole* recently established this principle as a nationwide rule, it did no more than confirm what this Court and others have held for years.  In *Perelman*, for example, this Court addressed standing in a case alleging mismanagement of plan assets by the fiduciary of a defined-benefit plan.  793 F.3d at 370.  As the Court noted, the "participants in such a plan are entitled only to a fixed periodic payment," the plaintiff had received "all distributions under the [p]lan to which he was entitled," and the plaintiff did not allege "an individual right to the profit" he sought to recover.  *Id.* 374-375 (citation omitted).  Given the dynamics of defined-benefit plans, this Court held that plaintiff failed to make the necessary "showing of individualized harm" to establish Article III standing.  *Id.*; *see also, e.g.*, *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013) ("a plaintiff must show she has an individual right to the defendant's profit and ... when a plan has the right to the profit, the individual plaintiff has not suffered a constitutional injury"); *Hein v. F.D.I.C.*, 88 F.3d 210, 224-225 (3d Cir. 1996) (no "legal injury stemming from the[] denial" of benefits that participant was "not entitled to").  And other courts had likewise reached that same conclusion.  *See, e.g.*, *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 530 (5th Cir. 2016) ("A bare allegation of improper defined-benefit-plan management under ERISA, without concomitant allegations that any

defined benefits are even potentially at risk, does not meet the dictates of Article III."); *Duncan v. Muzyn*, 885 F.3d 422, 428 (6th Cir. 2018) (a participant "under a defined-benefit plan has an interest only in his defined benefits—not in the entirety of the plan's assets"; he "suffers an injury only where the challenged action puts his defined benefits in jeopardy").

### B.    Under these principles, Plaintiffs lack standing for their mismanagement-of-Plan-assets claims.

Self-funded healthcare plans share many of the same characteristics that have animated the constitutional standing principles applied in defined-benefit cases. Both self-funded healthcare plans and defined-benefit plans are often funded by a general pool of assets to which employees frequently are required to contribute in order to participate, but no individual employee holds any particular equitable, legal, or property interest in any specific portion of those funds. *See Hughes*, 525 U.S. at 439; 2 App. 116-117 (¶¶19-20). Instead, as in defined-benefit plans, participants in self-funded healthcare plans have a legally protected interest only in receiving the "fixed set of benefits as promised in plan documents," *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 528 (9th Cir. 2023), because the employer "accept[s] the financial risk of coverage and obligation to pay claims using its own funds." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 602 (6th Cir. 2007); *see also N. Cypress*, 898 F.3d at 468; *Cent. States SE & SW Areas Health & Welfare v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 246 (2d Cir. 2009) ("self-funded

[p]lans assumed the direct risk of absorbing any increases in prescription drug costs").

Due to these shared features, courts have applied the reasoning of cases like *Thole* and *Perelman* to hold that healthcare-plan participants who were not denied plan benefits suffered no Article III injury from the alleged fiduciary mismanagement of plan assets.  1 App. 11.  In *Gonzalez de Fuente*, for example, the Second Circuit rejected the plaintiffs' contention that they suffered an Article III injury from the defendants' alleged misallocation of the employer's contributions to the plan—which the plaintiffs alleged otherwise could have been used "to provide superior health benefits."  858 F. App'x at 433.  Relying on *Thole*, the district court held that the plaintiffs had not alleged an Article III injury "because [they] did not allege that they were denied any healthcare benefits included in the [p]lan."  *Id.* at 433.  The Second Circuit agreed: because the plaintiffs "received all of their [promised health] benefits," they had "no concrete stake in th[e] dispute and therefore lack[ed] Article III standing."  *Id.* at 434 (citation omitted).  The Ninth Circuit has similarly relied on *Thole* to hold that participants in a healthcare benefits plan did not allege an Article III injury by claiming mismanagement of plan assets, where, like in *Thole*, the plan "provide[d] a fixed set of benefits as promised in plan documents" and the plaintiffs had "received" all those "contractually entitled … insurance benefits."  *Winsor*, 62 F.4th at 528.

Under these cases, Plaintiffs have not alleged an Article III injury. Plaintiffs have no legally protected individual interest in the general body of Plan assets that allegedly suffered a diminution in value, even if allegedly caused by fiduciary mismanagement. Instead, their only legally protected interest is in receiving the benefits promised to them in the Plan document, which MetLife bore the risk of providing irrespective of the performance or size of any trust.[4] And they do not allege that they were denied those benefits. Thus, as in *Winsor* and *Gonzalez de Fuente* (and *Thole* and *Perelman* and others), Plaintiffs lack standing to challenge MetLife's alleged mismanagement of Plan assets. 1 App. 11-12.

Plaintiffs' attempt to distinguish the defined-benefit cases discussed above is unpersuasive.

1. Plaintiffs contend that a defined-benefit plan participant does "not pay to access his or her pension benefits." Opening Br. 17. But that is untrue—employees are frequently required to make contributions to participate in defined-benefit plans,

---

[4] Because Plaintiffs have no equitable or property interest in the general body of Plan assets, Plaintiffs' "simplified illustration" (at 9-10) involving the allocation of a "surplus of Plan assets" is particularly off base. As the Supreme Court has made clear, in defined-benefit type plans, if the asset pool outperforms, the plan participants have no right to the resulting surplus—plan sponsors can use it to cover their own plan-related obligations such as reducing or suspending their employer contributions. *Hughes*, 525 U.S. at 439-440, 445; *Thole*, 140 S. Ct. at 1620 ("employer, not plan participants, receives any surplus left over after all of the benefits are paid"). Thus, they can claim no "legally protected interest" in that surplus and no injury from the failure to receive it. *Spokeo*, 578 U.S. at 338.

as *Hughes* explained.   525 U.S. at 435.   Indeed, employers can even establish defined-benefit plans with the expectation that employee contributions and investment earnings on those contributions will *fully* fund all benefits ultimately paid out.   *See, e.g.*, *ZT Employment Servs., LLC v. Gallagher Benefit Servs., Inc.*, No. 3:19-cv-381, 2021 WL 1199579, at *3 (S.D. Tex. Mar. 30, 2021).   In any event, the existence of employee contributions does not alter the analysis where those contributions are fixed, *i.e.*, defined by a plan at the outset, and the employer bears the risk of insufficient assets to satisfy the promised benefits.   Indeed, both *Gonzalez* and *Winsor* took into account the very types of cost-sharing obligations Plaintiffs point to here.   *See Gonzalez de Fuente*, 858 F. App'x at 434; *Winsor*, 62 F.4th at 526-528.

2.   Plaintiffs next argue that, unlike in defined-benefit plans, the benefits they ultimately receive "are tied to" the size of the trust and therefore "[d]epleting" the trust assets will harm their financial interests.   Opening Br. 18.   But this contention is contrary to all of the case law recognizing that the employer-sponsor of a self-funded healthcare plan, not the participants, bears the financial risk of a shortfall when making the decision to sponsor such a plan.   *See, e.g.*, *N. Cypress*, 898 F.3d at 468; *Depot*, 915 F.3d at 658; *Loren*, 505 F.3d at 602; *Cent. States*, 504 F.3d at 246. It is also contrary to Plaintiffs' own complaint, which cites many of these very cases. 2 App. 116 (¶19).   And it is unsupported by any well-pleaded allegations in

Plaintiffs' complaint. Plaintiffs do not, for example, point to any Plan provisions tying annual benefits to investment performance or the size of the trust, or making the promised benefits contingent on any factor beyond the employees' payment of premiums, copays, deductibles, and the like that are spelled out in Plan documents before employees decide whether to participate for the year. Nor have they alleged that the scope of Plan benefits ever *changed* from what MetLife determined they would be as set forth in the Plan document.

3. To the extent Plaintiffs are suggesting that a healthcare-plan sponsor's ability to change the scope of healthcare benefits from one year to the next makes healthcare plans akin to defined-contribution plans in which participants' benefits are tied to the size of any trust (rather than being defined by the promises made in the plan, like defined-benefit plans), Opening Br. 18 & n.3, that argument is unsupported by any authority of which MetLife is aware. It also misunderstands the nature of defined-benefit retirement plans and healthcare plans.

Both defined-benefit retirement plans and defined-benefit-type healthcare plans contain promises to pay benefits for a plan-specified period of time. Depending on the plan and the elections made by participants, defined-benefit retirement plans may promise to provide a specified guaranteed income (1) for the participant's life, (2) for the participant's life with a minimum term certain if the participant dies before the term expires, or (3) for the life of the participant and her

spouse, or it may call for a lump-sum payment upon retirement. *See* Kate Ashford, *Understanding Defined Benefit Pension Plans*, Forbes (Dec. 15, 2022), https://www.forbes.com/advisor/retirement/what-is-a-defined-benefit-plan/; PBGC, *A Predictable Secure Pension for Life* (Jan. 2000), https://www.pbgc.gov/ documents/a_predictable_secure_pension_for_life.pdf; Internal Rev. Serv., *Defined Benefit Plan*, https://www.irs.gov/retirement-plans/defined-benefit-plan (last updated June 5, 2023). And because these benefit periods are typically lengthy, the time of service, and thus often the term of employee contributions, are often lengthy as well. Ashford, *supra.*

Along similar lines, what healthcare plans promise (and what participants enroll in) is a specified level of benefits *for a single plan year*—without the lengthy vesting or contribution requirements that often accompany defined-benefit retirement plans. *See* 2 App. 116-117 (¶20); Supp. App. 9, 16; *cf. Plan year*, HealthCare.gov, https://shorturl.at/agmKP (last visited Dec. 28, 2023). Thus, if plan participants received all their healthcare benefits each plan year in exchange for any specified level of premiums, deductibles, copays, or coinsurance, then they have received precisely what they were promised under the plan. And those benefits, like in other defined-benefit plans, are not contingent on the level of assets in any trust. If healthcare claims are unexpectedly high (because of an unexpected global pandemic, for example) or investment income is unexpectedly low (because of

unexpected market forces), the promised benefit levels for that year do not change—that is, the plan sponsor must fund all properly incurred expenses irrespective of these factors.  That is what makes self-funded healthcare plans akin to defined-benefit plans.

To be sure, just as a participant can change benefits each year if her individual circumstances change, year to year the healthcare plan sponsor can establish the same healthcare benefits, different healthcare benefits (*e.g.*, with higher or lower premiums or employee contributions), or no healthcare benefits at all after the plan-specified term is over—and the plan sponsor might do so for a variety of reasons, including the financial circumstances of the company.  But the same is true of defined-benefit plans.  At any time, the plan sponsor can change the terms of the plan and reduce *future* benefits for a variety of reasons, including if their financial circumstances change, so long as they do not reduce the amount of benefits that they have already promised and that participants have already accumulated and become vested in.  *See* U.S. Dep't of Labor, *FAQs about Retirement Plans and ERISA* 4, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-compliance.pdf (last visited Dec. 22, 2023).

Given these qualities, the district court correctly recognized that the Plaintiffs' effort to allege standing by complaining about "excessive out-of-pocket costs" makes no sense.  1 App. 12.  The Plan here is not like a defined-contribution plan,

where the amount of a participant's benefits are determined by the participant's investment performance, rather than fixed by the plan document, and where participants' individual accounts can be charged for the plan's administrative costs. *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.  In those circumstances, unreasonable fees can directly detract from the participant's investment returns and, consequently, the benefits she receives (and over which the plan sponsor does not bear the financial risk of a shortfall).  *Id.* at 1-2; *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

Here, however, Plaintiffs are not alleging any economic injury to their own property interest in the Plan's assets by being charged unreasonable fees that diminished their investment returns.  Instead, the amount of their contributions and their benefits were both fixed by the Plan documents.  In this context, complaining about "excessive" out-of-pocket costs is effectively complaining about the level of benefits determined by MetLife and defined by the Plan.  But ERISA plaintiffs have no free-standing, legally protected interest in any particular level of healthcare benefits, or any defined benefits at all.  Because the existence, extent, and levels of benefits employers provide are all voluntary, and because the employer sponsoring a self-funded plan is responsible for paying claims no matter what, the participants' only legally protected interest is "in the nature of a contract"—that is, in receiving

the benefits from an employer or through a fiduciary that "they are legally and contractually entitled to receive" under the plan. *Thole*, 140 S. Ct. at 1618, 1620. Thus, that Plaintiffs here did not receive *more generous benefits* than those promised by the Plan does not amount to a constitutionally cognizable injury in fact. *See Spokeo*, 578 U.S. at 339 (requiring "an invasion of a legally protected interest" to establish constitutional "injury in fact" (citation omitted)); *accord Finkelman I*, 810 F.3d at 193; *Thorne*, 980 F.3d at 885.[5]    Indeed, that is the same "simple, commonsense reason" why the plaintiffs in *Thole* lacked standing: because they "received all of their vested pension benefits" that they were "legally entitled to receive." 140 S. Ct. at 1622.

---

[5] Plaintiffs' suggestion (at 18-20) that the district court created an ERISA exception to Article III or conflated a merits analysis with standing is misplaced.  Indeed, "standing 'often turns on the nature and source of the claim asserted,' whether it be statutory, constitutional, or otherwise." *Associated Builders & Contractors W. Pennsylvania v. Cmty. Coll. of Allegheny Cnty*., 81 F.4th 279, 288 (3d Cir. 2023) (quoting *Warth*, 422 U.S. at 500).  And as noted above, Supreme Court and Third Circuit precedents require an evaluation of the nature of the claim and whether it involves an alleged invasion of a legally protected interest.  Consequently, this Court and others have repeatedly rejected theories of injury based on allegations that plaintiffs did not receive something that they had no legally protected interest in obtaining.  *See, e.g.*, *Bauer v. Mortg. Elec. Registration Sys., Inc.*, 618 F. App'x 147, 148-149 (3d Cir. 2015); *Frempong v. Nat'l City Bank of Indiana*, 452 F. App'x 167, 171 (3d Cir. 2011) ("As the District Court concluded, Frempong suffered no 'injury-in–fact' because he had no legally protected interest in the property with respect to third parties."); *DeGenes v. Murphy*, 289 F. App'x 558, 559-560 (3d Cir. 2008); *Sampson v. Fed. Republic of Germany*, 250 F.3d 1145, 1156 (7th Cir. 2001); *Jacobs v. Verizon Commc'ns, Inc.*, No. 16 CIV. 1082 (PGG), 2017 WL 8809714, at *14 (S.D.N.Y. Sept. 28, 2017).

4.  Finally, Plaintiffs contend that "ERISA affords a wide array of remedies" in the event of an alleged statutory violation.  Opening Br. 12.  But it is well established that the existence of monetary remedies is insufficient to satisfy Article III where a plaintiff cannot establish constitutionally cognizable injury in fact.  *See, e.g.*, *TransUnion*, 141 S. Ct. at 2206.  Indeed, as the dissent in *Thole* repeatedly emphasized, the plaintiffs in that case sought the remedy of disgorgement.  140 S. Ct. at 1624, 1629, 1631 (Sotomayor, J., dissenting).  But the majority still held that the Plaintiffs lacked standing because they could not show an actual and individualized injury in fact.

### C.  Plaintiffs' "shortfall" theory was not raised below and is unsupported by factual allegations.

In an apparent attempt to argue around the defined-benefit cases discussed above, Plaintiffs repeatedly characterize this case as involving losses of Plan assets that resulted in a "shortfall" or "deficit" that MetLife required Plan participants to "make up" so that it could pay Plan benefits.  Opening Br. 1, 11, 14, 15, 21.  It is true that participants in a defined-benefit plan have standing to sue if they *do not receive* the benefits they are promised due to a depletion of plan assets, or if fiduciary mismanagement is "so egregious" that it results in a plan shortfall so significant that there is a "substantially increased" risk that the sponsor will be unable to pay those benefits.  *Thole*, 140 S. Ct. at 1619, 1621-1622.  The problem with this argument, though, is the same problem as in *Thole*—Plaintiffs did not plead it.  *Id.*  Indeed, not

once in Plaintiffs' complaint or in opposition to MetLife's motion to dismiss did Plaintiffs refer to any shortfall or deficit in Plan assets, argue that there was a risk that MetLife will be unable to pay promised benefits, or allege that MetLife increased costs to Plan participants to make up for any shortfall or deficit. Instead, this theory seems to be made from whole cloth on appeal.

This theory, though, highlights the *Twilight Zone* nature of Plaintiffs' claims of injury. The Plan documents expressly provide that MetLife would receive prescription-drug rebates and "appl[y] these rebates toward Plan expenses." 1 App. 8; Supp. App. 220. Plaintiffs did not plausibly allege any facts suggesting that MetLife violated this Plan provision by using prescription-drug rebates for non-Plan expenses.[6] And Plaintiffs do not appear to dispute on appeal that MetLife used these rebates to pay the expenses of providing health benefits to participants—benefits that MetLife bore the financial risk of providing, at the cost of hundreds of millions of dollars each year. 1 App. 6; Opening Br. 8. Thus, even if Plaintiffs had alleged that MetLife's retention of prescription-drug rebates created a "shortfall" in Plan

---

[6] Plaintiffs asserted in their district-court briefing that MetLife "took" the prescription-drug rebates "for its own use and enjoyment, with no benefit to the Plan whatsoever." 2 App. 77. But the complaint pleaded no factual allegations that MetLife used the rebates for any purposes unrelated to the Plan. Nor did it claim any violation of the Plan document by failing to apply prescription-drug rebates as provided therein. *See* 29 U.S.C. § 1104(a)(1)(D) (fiduciary breaches its duties if it fails to discharge its duties "in accordance with the documents and instruments governing the plan").

assets (which exist to pay healthcare benefits), it is unclear how MetLife's use of those same rebates *to pay healthcare claims* would not have filled any alleged gap.[7]

Plaintiffs vaguely seem to suggest (at 8) that the Plan's reference to "[t]he Plan Sponsor appl[ying] these rebates towards Plan expenses" would only permit MetLife to use prescription-drug rebates to pay "ordinary Plan expenses" like the fees charged by Plan service providers, rather than MetLife's "*own* expenses in funding the Plan." But the Plan uses the term "expenses" to refer not to service-provider fees but rather expenses incurred from participant claims for healthcare benefits. *See, e.g.*, Supp. App. 17 ("expenses eligible to be reimbursed to the Participant"); Supp. App. 40 ("claims expenses"); Supp. App. 192 ("medical expenses"); Supp. App. 217 ("Eligible Prescription Drug Expenses"). Moreover, in a self-funded healthcare plan where the plan sponsor has the burden of paying out all healthcare claims regardless of the size of the trust assets, there is no meaningful

---

[7] To the extent Plaintiffs imply that there must be something nefarious about MetLife receiving the rebates as contemplated under the Plan in order to pay Plan expenses, rather than having the Plan pay those expenses directly, that is a distinction without a difference. The Plan itself provided that many benefits would be "paid from the general assets of the [c]ompany" (Supp. App. 15)—a common practice of self-funded healthcare plans, as the complaint acknowledges. 2 App. 116 (¶19). Consistent with that Plan provision, MetLife's contract with Express Scripts provided that Express Scripts would "invoice Sponsor" (MetLife) for both "Claims Reimbursements" and "Administrative Fees" and that "Sponsor will pay" within two days of receiving that invoice. Supp. App. 235. In any event, it is entirely unclear how that alleged accounting function could possibly affect, much less harm, Plaintiffs, who did not allege that they did not receive their promised benefits.

37

distinction between "Plan expenses" and the sponsor's expenses—here, MetLife as Plan sponsor bears the financial risk of paying *all* expenses, and Plaintiffs' complaint did not allege that MetLife failed to do so, much less that MetLife created a funding "shortfall" that participants had to fill.

## II.    Plaintiffs' premium-inflation theory of harm was unsupported by well-pleaded factual allegations.

Plaintiffs also challenge the district court's independent conclusion that Plaintiffs lacked standing because they failed to plausibly allege individualized injury in the form of higher out-of-pocket expenses resulting from MetLife's alleged misuse of Plan assets.  1 App. 12.  But the district court correctly held that Plaintiffs' allegations of economic injury were conclusory and relied on speculation, rather than well-pleaded facts.  As the court recognized, Plaintiffs' allegations were framed in explicitly speculative terms (alleging that absent the alleged misconduct, their out-of-pocket costs "may have" been lower or they "may have" received a distribution of rebates).  1 App. 7, 12; 2 App. 123 (¶36).  And on appeal Plaintiffs point to no well-pleaded allegations that plausibly establish any concrete, rather than speculative, economic injury.

### A.    Plaintiffs advance the wrong legal standard on appeal in an attempt to salvage their conclusory and speculative allegations.

As an initial matter, Plaintiffs contend that the district court placed the pleading bar too high—that because the complaint offered "general factual

allegations of injury resulting from the defendant's conduct," the district court was required to fill in the gaps and "presume" the "specific facts that are necessary to support" the general allegations. Opening Br. 20 (brackets omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); Opening Br. 13 (quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)). Thus, according to Plaintiffs, generalized allegations that MetLife's actions resulted in inflated premiums and other out-of-pocket costs are sufficient. Opening Br. 13, 20.

This argument is simply wrong under *Twombly* and *Iqbal*, which this Court has explained are the "touchstone" in evaluating the sufficiency of standing allegations, and which require specific factual allegations supporting each element of constitutional standing. *Finkelman I*, 810 F.3d at 201; *see also Spokeo*, 578 U.S. at 338 ("Where, as here, a case is at the pleading stage, the plaintiff 'must clearly … allege facts demonstrating' each element" of standing. (citation omitted; ellipsis in original)).

Indeed, in the specific context of price-inflation theories of harm, this Court has adhered closely to *Twombly*, *Iqbal*, and *Spokeo* and rejected claims of economic injury based on labels, conclusions, speculation, and contingent chains of future events, rather than on well-pleaded factual allegations. In *Finkelman I*, for example, this Court held that a plaintiff did not plausibly allege an economic injury by asserting that the NFL's practice of providing most Super Bowl tickets to "league

insiders" caused him to pay more for his ticket on the secondary market. 810 F.3d at 198-199. Despite acknowledging that the theory relied "on the basic principle that '[a] reduction in supply will cause prices to rise,'" the Court still held it was too speculative. *Id.* at 199. Although plaintiff offered his "suspicion that []his ticket would have been cheaper," the Court had "no way of knowing whether" the NFL's ticketing practices "would have had the effect of increasing … prices on the secondary market" because plaintiff provided no "well-pleaded facts" supporting that suspicion. *Id.* at 200, 202.

The Court reasoned similarly in *Thorne*, holding there that the plaintiff, a tire customer of the defendant, did not allege an economic injury from the defendant's failure to register her tires with the manufacturer (an alleged statutory violation). 980 F.3d at 886-887. The plaintiff asserted that the defendant priced compliance with the registration requirement into the cost of her tires, which she said meant that she paid for more (registered tires) than what she received (unregistered tires). *See id.* at 883. Relying on *Finkelman I*, the Court rejected this theory of financial harm as requiring "speculation about market or firm-level effects." *Id.* at 887. It could have been that "market factors [might have led defendant] to increase its tire prices," but it also could have been that "demand might [have] be[en] too elastic for [defendant] to do so." *Id.* at 887. The Court "simply ha[d] no way of knowing" because the plaintiff "relie[d] on 'pure conjecture' about what [defendant's] prices

would be if it 'sold its [tires] differently,'" rather than well-pleaded factual allegations. *Id.* at 886-887.

The theories of economic injury in *Finkelman I* and *Thorne* failed because the plaintiffs did not plead *facts* plausibly supporting that general economic principles applied in the relevant market—*i.e.*, that the alleged economic injury was "concrete and particularized" rather than "conjectural and hypothetical." *Spokeo*, 578 U.S. at 339 (quotation marks omitted). This is underscored by the Court's decision addressing the *Finkelman I* plaintiff's reworked allegations. *See Finkelman v. Nat'l Football League*, 877 F.3d 504, 512 (3d Cir. 2017) (*Finkelman II*). On remand, the plaintiff alleged an Article III injury by "offer[ing] specific factual allegations above and beyond … just alleg[ing] that prices would be lower on the secondary market were it not for the NFL's withholding." 877 F.3d at 512.[8] He instead "alleged a causal chain justifying *why* the NFL's withholding set into motion a series of events that ultimately raised prices on the secondary market" based on facts that were

---

[8] *Finkelman I* remanded to the district court to consider whether it should allow plaintiff to replead, because this Court had raised plaintiff's lack of standing *sua sponte* on appeal. 810 F.3d at 193, 203. Here, a remand would be inappropriate because Plaintiffs had ample opportunity to establish their standing below, did not seek leave to amend in the district court, and do not argue on appeal that it was error for the district court to have dismissed their complaint without leave to amend. Nor have Plaintiffs identified any additional allegations that they could add to satisfy Article III's standing requirements. Plaintiffs have therefore forfeited the issue. *See Bozek v. PNC Bank*, No. 20-3515, 2021 WL 4240359, at *2 n.3 (3d Cir. Sept. 17, 2021).

"specific" and "plausible." *Id.* at 513. Specifically, the plaintiff "alleged that the insiders … [we]re more likely to resell … tickets through third-party brokers to keep those sales anonymous, and those brokers in turn [we]re more likely to charge higher prices," and that "if more tickets were made available to fans initially, fans would be more likely … to sell through direct fan-to-fan sales, and the prices would likely be lower." *Id.* at 512.

Thus, Plaintiffs are simply incorrect that general allegations of economic injury are sufficient to establish standing—the Supreme Court and this Court have consistently required plaintiffs to clearly and plausibly allege a concrete and particularized economic injury, rather than one that is based on conjecture and speculation. As explained below, Plaintiffs' allegations fail that test.

**B. Plaintiffs' allegations of economic harm rest on speculation rather than well-pleaded factual allegations clearly alleging injury in fact.**

Here, like in *Finkelman I* and *Thorne*, Plaintiffs' inflated-premiums theory of economic harm rests on conclusory and unsupported assertions, coupled with speculation about what their premiums and other costs would have been had MetLife acted differently than alleged.

1. As the district court recognized, Plaintiffs' own allegations were expressly framed in a speculative and conjectural way. 1 App. 12. Plaintiffs alleged that if MetLife had not received and used the prescription-drug rebates, but rather allocated them to the general body of trust assets, Plan participants "may have" benefitted

from reduced copays, or MetLife "may have" simply handed out money to Plan participants "in proportion to their contributions to the plan." *Id.*; 2 App. 123 (¶36). Of course, the same paragraph also alleges that it "may" also have been "consistent with its fiduciary duties" for MetLife to reduce its own "contributions on account of the rebates" (2 App. 123 (¶36)), which only underscores how speculative Plaintiffs' allegations of economic injury were.

Even aside from cases like *Finkelman I* and *Thorne*, these are precisely the types of speculative allegations of economic injury that courts have rejected. In *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003), for example, this Court addressed whether the plaintiff suffered an "individual loss" by claiming that her employer was forced to overpay for the healthcare benefits she received as a result of the insurer's allegedly improper payment of "physician incentives." *Id.* at 456-457. The plaintiff in *Horvath* argued, like Plaintiffs here, that she was financially harmed because had the insurer not paid the incentives, the employer would have saved money and "would have passed th[o]se savings on to its employees." *Id.* at 457. But the Court found "this reasoning far too speculative to serve as the basis for a claim of individual loss." *Id.*

Although *Horvath* was decided at summary judgment, courts have reached similar conclusions at the pleading stage, where the plaintiffs failed to plausibly plead non-speculative injury. In *Loren*, for example, the Sixth Circuit rejected

allegations analogous to those here—*i.e.*, that a plaintiff's contributions to his health plan "probably would have been less had" the defendant-insurer acted differently. 505 F.3d at 608-609. The court held that these allegations were "too speculative" because they were based on the "assum[ption] that [the plan sponsors] would pass on any [cost] increase[s]" occasioned by the insurer's conduct in the first place—an assumption for which the plaintiffs had no factual support. *Id.* The Ninth Circuit has also twice rejected similar theories of hypothetical cost savings as too speculative to withstand the Article III inquiry. *See Glanton v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (allegation that "plans might … reduce contributions or co-payments" if plans' PBM had not "charged the plans too much" was speculative because there was nothing "forc[ing]" the plans' sponsors to do so); *Winsor*, 62 F.4th at 524-525 (plaintiffs did "not demonstrate that they paid higher contributions" due to the plan sponsor's allegedly wrongful conduct because the plaintiffs did not allege the sponsor "would [have] change[d] employee contribution rates").

Plaintiffs attempt to bolster their "may have" allegations by arguing that these allegations "accord with normal actuarial principles" and the "ordinary practice among self-funded health plans" to use drug rebates to reduce premiums. Opening Br. 21. In light of these principles and ordinary practice, they say, "it is eminently plausible" that MetLife's alleged actions "caused at least *some* increase in their

health insurance premiums." *Id.* But even putting aside the fact that Plaintiffs pleaded nothing to indicate that these principles or practices are incorporated into the Plan here, none of the sources Plaintiffs cite actually support what "normal actuarial principles" and "ordinary practice[s]" are for self-funded healthcare plan sponsors.

For the "normal actuarial principles" that Plaintiffs suggest exist, they cite two cases, conspicuously using a *cf.* signal without any explanation of how those sources lend a hand. Opening Br. 21 (citing *Denton v. First Nat. Bank of Waco, Texas*, 765 F.2d 1295, 1298 n.5 (5th Cir. 1985); *Wachtell, Lipton, Rosen & Katz v. Comm'r*, 64 T.C.M. (CCH) 128 (T.C. 1992), *aff'd*, 26 F.3d 291 (2d Cir. 1994)). That was no accident. *Denton* is a case about whether an employee should have received a lump-sum pension payment upon his departure from the company, 765 F.2d at 1297, and *Wachtell* is a Tax Court case about whether the actuaries employed by a law firm used the appropriate "actuarial assumptions" when completing their analyses, 64 T.C.M. (CCH) 128. The portions of these opinions Plaintiffs cite simply describe the many factors that actuaries of defined-benefit plans consider when determining the level of contributions that plan sponsors must make to maintain the requisite funding levels required by ERISA and the Internal Revenue Code. *Denton*, 765 F.2d at 1298 n.5; *Wachtell*, 64 T.C.M. (CCH) 128. Nothing in these decisions suggests anything about *participant contributions* or how they are impacted by the size of

plan assets or a plan sponsor's use (or not) of trust assets to pay benefits promised under a plan. Nor do they provide any support for the proposition that MetLife's use of prescription-drug rebates "necessarily caused Plan participants … to pay higher premiums," as Plaintiffs elsewhere suggest. Opening Br. 9.

For the purportedly "ordinary practice" among employer-sponsored self-funded healthcare plans to use prescription-drug rebates to reduce plan-participant premiums, the Government Accountability Office ("GAO") report Plaintiffs cite is equally unhelpful to their cause. Opening Br. 21 (citing U.S. Gov't Accountability Office, *Medicare Part D: CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending* (Sep. 5, 2023), https://www.gao.gov/products/gao-23-105270). Perhaps the most obvious tell is the part of the document title that Plaintiff's citation sketchily omits—"*Medicare Part D.*" And a brief examination of the document confirms it: the report contains no reference to self-funded plans, under which employers bear the risk of paying promised benefits. Indeed, it does not address ERISA-governed plans at all. Instead, it discusses "private companies that provide voluntary Medicare Part D prescription drug coverage"—a coverage not at issue here and a different type of "plan sponsor" than is referred to in ERISA parlance. *Id.* at 2.[9]

---

[9] The same is true of the other GAO report Plaintiffs cite on page 7 of their brief. *See* U.S. Gov't Accountability Office, *Medicare Part D: Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* (July 2019),

In short, as the district court properly concluded, Plaintiffs' allegation that their out-of-pocket expenses "may have" been higher due to the alleged mismanagement of Plan assets was speculative—it was unaccompanied by any of the specific factual allegations that this Court has recognized are necessary to plausibly allege an actual and concrete injury in fact.

2. Largely ignoring the complaint's "may have" allegations, which were the focus of the district court's analysis, Plaintiffs point to two other paragraphs (paragraph 20 and paragraph 30) that they contend satisfy the applicable pleading requirements.  Plaintiffs contend that these paragraphs specifically and plausibly allege that MetLife set participant-contribution amounts based on a "mathematical formula" that used the size of Plan assets as a relevant input "in a manner that would result in lower required premium payments" if prescription-drug rebates were part of the general pool of trust assets.  Opening Br. 23.  According to Plaintiffs' brief, these allegations assert that "[p]er the formula used to set premiums, depleting these Plan assets necessarily caused an increase in" participant premiums once MetLife received the prescription-drug rebates.  Opening Br. 21.  These paragraphs allege no such thing.

---

https://www.gao.gov/assets/gao-19-498.pdf.  This report (from which Plaintiffs also omit the words *Medicare Part D*" in the document title) likewise contains no reference to self-funded healthcare plans, ERISA, or employer or employee contributions to those plans.

Paragraph 20 alleges the process through which MetLife purportedly funds the Plan. It alleges that MetLife starts by determining the anticipated cost of coverage for the entire Plan, and then separates this total figure into a premium for each employee, spouse, and dependent expected to enroll. 2 App. 116-117 (¶20). Next, it alleges that Plan participants electing coverage under the Plan are charged a percentage of that total premium, depending upon a "fixed formula determined by Defendant," which the complaint elsewhere alleges is based on the level of coverage chosen and the participating employee's job classification. *Id.*; 2 App. 115 (¶¶13-14). It then alleges that MetLife "pay[s] the balance of the cost of coverage." 2 App. 117 (¶20).

Nothing in these allegations provides factual support for Plaintiffs' premium-inflation theory. Plaintiffs do not allege any formula for calculating participant premiums that is based on the size of the general pool of trust assets, nor do they provide any facts plausibly suggesting that the size of Plan assets "necessarily caused an increase in Plaintiffs'-Appellants' premiums" or that removing or adding money into that pool will "result in lower required premium payments." Opening Br. 21, 23.

Nor does the end of paragraph 20 (the part that comes after the allegations about MetLife's funding process) support the characterizations in Plaintiffs' brief. It states that the "overall level of premiums and the amount charged to participants

48

is determined based on the cost of 'projected medical claims,'" citing two cases in support. 2 App. 116-117 (¶20) (citing *ZT Employment*, 2021 WL 1199579, at *1; *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1368 (11th Cir. 2011)). As an initial matter, even if the estimated costs of projected future claims *do* figure into the total premiums that MetLife calculates before determining employee contributions, Plaintiffs nowhere allege that MetLife *did not include* estimated prescription-drug rebates in that calculation. So this assertion offers no support for Plaintiffs' premium-inflation theory. Moreover, this is not a factual allegation about the MetLife Plan; it is an attorney argument purportedly supported by case law. And even if legal citations could constitute well-pleaded factual allegations—and obviously they can't—these cases would not help Plaintiffs.

*ZT Employment* was about a plan that was designed so that the employer would pay nothing and employee contributions (and the income from investing those contributions) would pay 100% of plan costs. In that context, the court said, the employer collected premiums "from its employees to cover projected medical claims." 2021 WL 1199579, at *1. That is not the Plan structure here, where MetLife's contributions covered the vast majority of promised Plan benefits, and so *ZT Employment* indicates nothing about how MetLife determined premiums, let

49

alone how it calculated the portion of those premiums that Plan participants would be required to pay.

*Ironworkers* is even more off-base. The complaint asserts that *Ironworkers* "explain[s] that sponsors of self-funded plans 'adjust[] their premiums upward to reflect the projected value of claims for [heightened prescription drug costs].'" 2 App. 117 (¶20). But *Ironworkers* was not even about employer-sponsored "self-funded plans"; it was about how *insurers* (who do not subsidize healthcare costs) price the premiums they charge to enrollees to take into account the risks of things like fraud and off-label prescriptions. 634 F.3d at 1368.

Paragraph 30 does not provide any factual support for Plaintiffs' speculative premium-inflation theory either. It first contains a variety of legal arguments and citations to support the proposition that prescription-drug benefit contracts constitute "plan assets" and then summarily adds that "MetLife's transfer of rebates to itself reduced the assets available to provide benefits, necessarily resulting in higher premiums," followed by a citation to paragraph 20. But of course paragraph 20 does not actually say this, and paragraph 30 offers no factual allegations to support it either.

These two paragraphs are the only portions of the complaint Plaintiffs cite to support their premium-inflation theory of injury, and neither clearly alleges facts demonstrating actual and concrete injury that is neither speculative nor conjectural.

On the whole, Plaintiffs' claims of economic injury rest on the type of "pure conjecture" that provides this Court with "no way of knowing whether" MetLife's alleged conduct "would have had the effect of increasing or decreasing" Plaintiffs' out-of-pocket costs. *Finkelman I*, 810 F.3d at 200; *Thorne*, 980 F.3d at 887. Because "Article III injuries require a firmer foundation" that Plaintiffs must plausibly establish as the parties seeking to invoke the Court's jurisdiction, *Finkelman I*, 810 F.3d at 201, the district court correctly held that Plaintiffs' allegations were too "speculative and conclusory" to survive, 1 App. 12.

*****

Plaintiffs are correct about one thing: "There is no ERISA exception to Article III"—courts are to apply the "ordinary Article III standing analysis." Opening Br. 11-12 (quoting *Thole*, 140 S. Ct. at 1622). But it is under that "ordinary" Article III analysis that Plaintiffs' claims fail for lack of standing. They have no legally protected interest in the allegedly depleted general pool of assets that support the payment of healthcare claims. They received all of the healthcare benefits that they were promised under the Plan. And their premium-inflation theory is speculative and unsupported by any factual allegations clearly alleging economic injury. The district court followed precedent and correctly held that Plaintiffs failed to plausibly allege an Article III injury. This Court should affirm that decision.

## III.   The district court did not conflate constitutional and statutory standing.

Plaintiffs additionally ask for reversal because they contend that the district court in substance evaluated statutory standing but did so under Rule 12(b)(1), which governs constitutional standing.  Opening Br. 25-28.

Respectfully, this argument makes no sense.  The district court's entire standing analysis addressed constitutional standing.  It did so in a section titled "Article III Standing Analysis."  1 App. 8.  It cited Supreme Court and Third Circuit precedents specifically addressing constitutional standing.  1 App. 7-13.  It concluded that Plaintiffs' complaint failed to plead facts demonstrating non-speculative and non-conclusory injury in fact.  1 App. 11-13.  It properly did so under Rule 12(b)(1), which is the rule under which "[c]onstitutional standing … is properly tested."  *Thorne*, 980 F.3d at 885.  And when finished with its constitutional-standing analysis, the district court expressly "denied as moot" MetLife's "motion to dismiss for lack of statutory standing."  1 App. 13.  To the extent Plaintiffs argue (at 26) that it was improper for the court to consider the "extracontractual" nature of the cost reductions they "may have" received in connection with the constitutional standing analysis, Plaintiffs are incorrect.  As the Supreme Court's and this Court's precedents demonstrate, constitutional standing's injury-in-fact requires courts to consider whether a plaintiff has pointed to an

invasion of "legally protected" interests.  *See supra*, pp. 22-34.[10]  Indeed, that is in essence why the Supreme Court held in *Thole* that the plaintiffs suffered no Article III injury—because they "received all of their vested pension benefits" that they were "legally entitled to receive."  140 S. Ct. at 1622.  It is therefore entirely unclear what error Plaintiffs believe the district court made.

Plaintiffs' cursory argument does nothing to clarify that point.  But even if some confusion or conflation were in fact evident in the district court's opinion, that would be no basis to reverse and remand "without reaching the outcome of the district court's analysis."  Opening Br. 28.  This Court's review is *de novo*, and the Court can affirm on any basis supported by the record.  *See Univ. Spine Ctr. v. Aetna, Inc.*, 774 F. App'x 60, 62 & n.1 (3d Cir. 2019) (affirming dismissal of ERISA claims for lack of standing even though the district court evaluated the issue under the incorrect Federal Rule of Civil Procedure).  As explained above, Plaintiffs' claims fail for lack of constitutional standing.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

---

[10] Plaintiffs' argument on this front is another version of their argument (at 18-20) that the district court conflated a merits analysis with standing.  It fails for the same reasons discussed above.  *See supra*, note 5.

Dated:  December 28, 2023

Respectfully submitted,

*/s/ Jaime A. Santos*
Jaime A. Santos
**GOODWIN PROCTER LLP**
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
JSantos@goodwinlaw.com

James O. Fleckner
David Rosenberg
Christopher J.C. Herbert
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
JFleckner@goodwinlaw.com
DRosenberg@goodwinlaw.com
CHerbert@goodwinlaw.com

*Counsel for Defendant-Appellee MetLife Group, Inc.*

## COMBINED CERTIFICATIONS

### Certificate of Admission to Bar

The undersigned certifies that all attorneys whose names appear within this brief are members of the Bar of this Court.

### Certificate of Compliance with Fed. R. App. 32(a)

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 12,976 words as calculated by the word processing system used to prepare this brief. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14 point Times New Roman.

### Certificate of Service and Compliance With LAR 31.1(c)

I electronically filed this brief using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system. The text of the electronic brief is identical to the text of the paper copies delivered to the Court. The Symantec Endpoint Protection Version 12.1.7004.6500 has been run on the electronic brief, and no virus was detected.

Dated: December 28, 2023      /s/ Jaime A. Santos

                                           Jaime A. Santos

                                           *Counsel for MetLife Group, Inc.*