No. 23-2420

*In the*

# United States Court of Appeals

*for the*

# Third Circuit

MARLA KNUDSEN, ET AL.,

*Plaintiffs-Appellants*,

v.

METLIFE GROUP, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of New Jersey
No. 2:23-cv-00426-WJM-ESK
Hon. Judge William J. Martini

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

Charlie C. Gokey
Engstrom Lee LLC
729 N. Washington Avenue, Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
cgokey@engstromlee.com

*Attorney for Plaintiffs-Appellants*
*Marla Knudsen, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...............................................................................1

ARGUMENT .....................................................................................1

I.    PLAINTIFFS-APPELLANTS' ALLEGED FINANCIAL LOSS IS AN INJURY-IN-FACT FOR PURPOSES OF ARTICLE III STANDING. ........1

    A.    Plaintiffs allege a personal financial injury, not merely "depletion of a general pool of assets" held by the Plan.................................................1

    B.    Plaintiffs-Appellants' financial injury establishes that MetLife invaded a legally protected interest for purposes of standing...............4

    C.    Plaintiffs-Appellants have not argued that the Plan was underfunded. ..........................................................................................11

II.    PLAINTIFFS HAVE ADEQUATELY PLED A FINANCIAL INJURY....13

    A.    MetLife is wrong that allegations of an injury-in-fact must be pled in exacting detail....................................................................................13

    B.    The allegations of Plaintiffs-Appellants' complaint are more than sufficient to plead an injury-in-fact.....................................................16

III.    THE DISTRICT COURT CONFLATED ARTICLE III AND STATORY STANDING. ................................................................................23

CONCLUSION ................................................................................24

CERTIFICATE OF COMPLIANCE....................................................26

ELECTRONIC DOCUMENT CERTIFICATE .....................................27

CERTIFICATE OF BAR ADMISSION ...............................................28

CERTIFICATE OF PERFORMANCE OF VIRUS CHECK .................29

i

CERTIFICATE OF SERVICE ...............................................................30

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,

    821 F.3d 352 (2d Cir. 2016) ................................................................7

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,

    821 F.3d 352 (2d Cir. 2016) ................................................................7

*Associated Builders & Contractors W. Pennsylvania v. Cmty. Coll. of Allegheny Cnty.*,

    81 F.4th 279 (3d Cir. 2023) ...............................................................8

*Bauer v. Mortg. Elec. Registration Sys., Inc.*,

    618 F. App'x 147 (3d Cir. 2015).........................................................8

*Boley v. Universal Health Servs., Inc.*,

    36 F.4th 124 (3d Cir. 2022) .............................................................22

*Boudreaux v. Louisiana State Bar Ass'n*,

    3 F.4th 748 (5th Cir. 2021) ..............................................................18

*Braden v. Wal-Mart Stores, Inc.*,

    588 F.3d 585 (8th Cir. 2009) ..................................................... 19, 22

*Cf. Coleman Motor Co. v. Chrysler Corp.*,

    525 F.2d 1338 (3d Cir. 1975) ...........................................................11

*CIGNA Corp. v. Amara*,

    563 U.S. 421 (2011).........................................................................9

*Const. Party of Pennsylvania v. Aichele*,

    757 F.3d 347 (3d Cir. 2014) ............................................................13

*Cottrell v. Alcon Lab'ys*,

    874 F.3d 154 (3d Cir. 2017) ...................................... 5, 6, 7, 8, 9, 23

*Czyzewski v. Jevic Holding Corp.*,

    580 U.S. 451 (2017)..........................................................................2

*Danvers Motor Co. v. Ford Motor Co.*,

    432 F.3d 286 (3d Cir. 2005) ........................................... 2, 5, 6, 13

*Davis v. Wells Fargo*,

    824 F.3d 333 (3d Cir. 2016) ......................................................6, 13

*Edmonson v. Lincoln Nat. Life Ins. Co.*,

    725 F.3d 406 (3d Cir. 2013) ......................................................4, 20

*Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*,

    769 F.3d 850 (3d Cir. 2014) ..........................................................18

*Finkelman v. Nat'l Football League*,

    810 F.3d 187 (3d Cir. 2016) ..................................................... 14, 15

*Finkelman v. Nat'l Football League*,

    877 F.3d 504 (3d Cir. 2017) ..................................................... 15, 16

*Gimeno v. NCHMD, Inc.*,

    38 F.4th 910 (11th Cir. 2022) .........................................................9

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,

    465 F.3d 1123 (9th Cir. 2006) ......................................................21

*Goldenstein v. Repossessors Inc.*,

    815 F.3d 142 (3d Cir. 2016) ..........................................................12

*Gonzalez de Fuente v. Preferred Home Care of New York LLC*,

    858 F. App'x 432 (2d Cir. 2021) ....................................................3

*Gonzalez de Fuente v. Preferred Home Care of New York LLC*,

    No. 18CV06749, 2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020)......................3

*Graden v. Conexant Sys. Inc.*,

    496 F.3d 291 (3d Cir. 2007) ..........................................................10

*Herbert v. Nat'l Acad. of Scis.*,

    974 F.2d 192 (D.C. Cir. 1992).........................................................20

*Horvath v. Keystone Health Plan East, Inc.*,

    333 F.3d 450 (3d Cir. 2003) ...........................................................20

*In re Ins. Brokerage Antitrust Litig.*,

    579 F.3d 241 (3d Cir. 2009) .............................................................6

*John v. Whole Foods Mkt. Grp., Inc.*,

    858 F.3d 732 (2d Cir. 2017) ...........................................................17

*Loren v. Blue Cross & Blue Shield of Michigan*,

    505 F.3d 598 (6th Cir. 2007) ................................................... 20, 21

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992).......................................................... 6, 13, 20

*Menkes v. Prudential Ins. Co. of Am.*,

    762 F.3d 285 (3d Cir. 2014) .............................................................9

*Nat'l Sec. Sys., Inc. v. Iola*,

    700 F.3d 65 (3d Cir. 2012) ...............................................................9

*Osborn v. Visa Inc.*,

    797 F.3d 1057 (D.C. Cir. 2015)......................................................15

*Perelman v. Perelman*,

    793 F.3d 368 (3d Cir. 2015) .........................................................2, 3

*Potter v. Cozen & O'Connor*,

    46 F.4th 148 (3d Cir. 2022) ...........................................................24

*Singleton v. Wulff*,

    428 U.S. 106 (1976).......................................................................12

*Thole v. U. S. Bank N.A.*,

    140 S. Ct. 1615 (2020)................................................. 2, 3, 5, 6, 9

Thorne v. Pep Boys,

 980 F.3d 879 (3d Cir. 2020) ................................................................... 14, 15

*TransUnion LLC v. Ramirez*,

 594 U.S. 413 (2021)............................................................................... 1, 2, 6

*Winsor v. Sequoia Benefits and Insurance Services, LLC*,

 62 F.4th 517 (9th Cir. 2023). ..................................................................4, 22

**Rules**

Federal Rule of Civil Procedure 12 ........................................................ 8, 16, 19, 23

**Other Authorities**

Rod Serling, *Twilight Zone Monologue* (1959).......................................................12

## INTRODUCTION

MetLife strains to make a simple question seem complicated. Its brief includes lengthy discursions on the nature of defined benefit plans, the similarities between pension and health plans, and the allocation of risk between plan sponsors and participants. None of that is especially germane to the issue before the Court.

The question the Court must answer here is straightforward: whether an ERISA plaintiff who alleges that they lost money due to the defendant's breach of its fiduciary duty has pled an Article III injury. The answer to that question is not found in abstract descriptions of defined benefit plans, but in hornbook law. And the answer is as straightforward as the question: "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). That principle squarely controls here. The Court should reverse and remand.

## ARGUMENT

## I.    PLAINTIFFS-APPELLANTS' ALLEGED FINANCIAL LOSS IS AN INJURY-IN-FACT FOR PURPOSES OF ARTICLE III STANDING.

### A.    Plaintiffs allege a personal financial injury, not merely "depletion of a general pool of assets" held by the Plan.

MetLife first argues at considerable length that Plaintiffs-Appellants cannot establish an Article III injury based on the mere "depletion of a general pool of assets" held by the Plan. *See* Brief of Defendant-Appellee ("Opp.") at 21-38. But

1

as Plaintiffs-Appellants explain in their opening brief, they do not contend

otherwise. *See* Brief of Plaintiffs-Appellants ("Br.") at 15-18.

Rather, Plaintiffs-Appellants assert they have suffered an injury-in-fact for

purposes of Article III standing because they personally lost money as a result of

MetLife's unlawful conduct. MetLife took $65,237,379 from the Plan for itself that

otherwise would have funded Plaintiffs-Appellants' health benefits, thus causing

them to pay higher premiums. "Monetary harm is a classic form of injury-in-fact,"

such as where the plaintiff has been "forced to pay money it otherwise would have

kept for itself." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir.

2005). It is black-letter law that *any* monetary injury, no matter how small,

supports standing under Article III. *See, e.g.*, *TransUnion*, 594 U.S. at 425;

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).

MetLife's extended argument about depleting a general pool of plan assets is

therefore irrelevant and the cases it cites inapposite. For example, MetLife relies

heavily on the Supreme Court's opinion in *Thole* and this Court's opinion in

*Perelman* to argue Plaintiffs-Appellants lack standing. Opp. at 23-25 (discussing

*Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615 (2020), and *Perelman v. Perelman*, 793

F.3d 368, 374 (3d Cir. 2015)). But as explained in Plaintiffs-Appellants' opening

brief, *see* Br. at 16-18, both cases are readily distinguishable for a simple reason: in

both *Thole* and *Perelman*, the plaintiffs concededly suffered no personal financial

harm. *See Thole*, 140 S. Ct. at 1618; *Perelman*, 793 F.3d at 374. Both cases

2

involved mere "diminution in plan assets, without more." *Perelman*, 793 F.3d at

374. Here, there is more—a personal financial loss that Plaintiffs-Appellants have

suffered and seek to remedy. Despite dedicating pages to these cases, MetLife

conspicuously fails to mention the grounds on which Plaintiffs-Appellants

distinguished this authority in their opening brief. It apparently has no response.

This same distinction likewise renders the other authority MetLife cites

inapposite. For example, MetLife discusses the Second Circuit's unpublished

opinion in *Gonzalez de Fuente v. Preferred Home Care of New York LLC*, 858 F.

App'x 432, 433 (2d Cir. 2021). But in *Gonzalez*, as in *Thole* and *Perelman*, the

plaintiffs did not allege any personal financial injury. Their employer made

premium payments to an insurer, and the insurer remitted investment gains and

excess payments back to the employer. *See Gonzalez de Fuente v. Preferred Home

Care of New York LLC*, No. 18CV06749, 2020 WL 5994957, at *1 (E.D.N.Y. Oct.

9, 2020). The plaintiffs complained that they received poor health benefits, and that

under New York law, the money remitted to the employer should instead have

been used to improve their benefits. *Gonzalez*, 858 F. App'x at 434. But they had

not lost a cent, and their health benefits would not change even if they prevailed, so

"they 'ha[d] no concrete stake in th[e] dispute and . . . lack[ed] Article III

standing." *Id.* at 434. That contrasts sharply with the facts of this case, in which

Plaintiffs-Appellants lost money that they seek to recover. *See* Br. at 16-17, 23-25.

3

MetLife offers another inapposite analogy to this case in citing *Winsor v. Sequoia Benefits and Insurance Services, LLC*, 62 F.4th 517 (9th Cir. 2023). MetLife cites a portion of that opinion in which the Ninth Circuit rejected the plaintiffs' argument they "retained an 'equitable' ownership interest" in the assets of a health plan, and thus mismanagement of those assets afforded the plaintiffs standing "even if they suffered no tangible out-of-pocket loss." *Id.* at 527. That again is not the argument Plaintiffs-Appellants advance here.

None of the authority MetLife cites addresses a situation like that before the Court. This case does not concern "mismanagement" of plan assets, the only consequence of which was the "depletion of a general pool of assets" belonging to the Plan, as MetLife would have it. Opp. at 21-22. Rather, MetLife illegally took for itself $65,237,379 that would otherwise have been available to fund health benefits under the Plan, then required Plaintiffs-Appellants to pay higher premiums to replace what it took—a personal loss Plaintiffs-Appellants now seek to recover.[1]

## B.    Plaintiffs-Appellants' financial injury establishes that MetLife invaded a legally protected interest for purposes of standing.

Recognizing the misalignment between the authority it cites and the facts here, MetLife attempts to wring a novel principle of constitutional law from the

---

[1] MetLife includes a lengthy string citation at the end of this section of its brief listing cases with disparate holdings and facts. None of this authority does more than make the general point that an ERISA plaintiff must demonstrate a personal injury to establish standing, and some it seems clearly to support Plaintiffs-Appellants' position. *See, e.g., Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013) (confirming that a participant in a defined benefit plan may bring a claim for disgorgement under ERISA to recover a personal loss).

cases discussed above. MetLife contends that, where an ERISA plaintiff's "benefits are specifically defined by their plan[ ]," the plaintiff lacks Article III standing to sue for breach of ERISA fiduciary duties unless they can "allege that they failed to receive the benefits they were promised" or that their benefits were placed at risk. Opp. at 21-22. According to MetLife, no other injury—not even a substantial financial loss—will satisfy Article III in the context of ERISA claim by a defined benefit plan participant, even if it would in another context. *See id*.

That is as wrong as it sounds. "There is no ERISA exception to Article III," and ERISA claims require only "ordinary Article III standing analysis" that courts should not "make . . . more complicated than it needs to be." *Thole*, 140 S. Ct. at 1622. None of the authority upon which MetLife relies so much as suggests that, where a defendant's violation of ERISA causes a plaintiff to lose money, the Constitution applies differently than it would to any other claim.

MetLife grounds its argument in the assertion that Plaintiffs-Appellants have not pled an invasion of a "legally protected interest," one essential component of an Article III injury. *See Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162 (3d Cir. 2017). But as this Court has explained, "financial or economic interests are 'legally protected interests' for purposes of the standing doctrine." *Id*. at 164. That includes "interests in . . . money [a plaintiff] had to spend" as a result of a defendant's allegedly unlawful conduct that they otherwise would have kept. *Id*. at 165; *see also Danvers*, 432 F.3d at 293.

5

Plaintiffs-Appellants allege they lost money when they were forced to pay higher insurance premiums as a result of MetLife's breach of its ERISA fiduciary duties. This type of out-of-pocket loss caused by a defendant's conduct is a paradigmatic invasion of a legally protected interest for purposes of Article III standing. *See TransUnion*, 594 U.S. at 425; *Cottrell*, 874 F.3d at 163; *Danvers*, 432 F.3d at 293. Indeed, this Court has previously held that, where a plaintiff pays inflated insurance premiums, the plaintiff has "suffered an injury in fact that is concrete and particularized" and that is "sufficient to establish their standing." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 275 (3d Cir. 2009). It is hard to see why that would not hold true here just because this case arises under ERISA. "Standing is meant to serve as 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) (quoting *Lujan* v. Defs. Of Wildlife, 504 U.S. 555, 560 (1992)); *see also Thole*, 140 S. Ct. at 1622 (noting ERISA claims require only "ordinary Article III standing analysis").

MetLife nonetheless attempts to avoid this conclusion in two ways. First, it argues that Plaintiffs-Appellants had "no legally protected individual interest in the general body of Plan assets" that MetLife plundered. Br. at 28. But as discussed above, that argument is a straw man. Regardless of whether Plaintiffs-Appellants had a legally protected interest in the sums MetLife unlawfully took from the Plan,

6

they had a legally protected interest in the amounts they were forced to pay as a result of MetLife's breach of its fiduciary duties. *See Cottrell*, 874 F.3d at 164.

MetLife further argues that Plaintiffs-Appellants suffered no injury because ERISA does not afford Plaintiffs-Appellants a "free-standing, legally protected interest" in paying any specific premium amount for health benefits. Opp. at 30-34. This argument fails for at least three reasons.

*First*, MetLife "cast[s] aside the essential components of injury in fact" and "improperly . . . cross[es] over in [its] analysis from standing to merits." *Cottrell*, 874 F.3d at 163. "The purpose of the injury-in-fact requirement" is simply "'to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.'" *Id.* at 162 (citation omitted). There is a "fundamental separation between standing and merits at the dismissal stage," and courts must therefore "assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims." *Id.* at 162. So, for example, a plaintiff who pleads they have lost money as a result of an ERISA violation has established a "personal financial stake[ ] in the suit" sufficient to satisfy the injury requirement of Article III, even if ERISA ultimately does not protect the plaintiff's financial interest or give them a right of recovery. *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016).

Here, MetLife argues that it did not violate ERISA when it caused Plaintiffs-Appellants to pay inflated premiums, and so they have no legally protected interest

in the sums they allege they lost. *See* Opp. at 30-34. But "[t]he most important" principle here is that "whether a plaintiff has alleged an invasion of a 'legally protected interest' does not hinge on whether the conduct alleged to violate a statute does, as a matter of law, violate the statute." *Cottrell*, 874 F.3d at 164. Plaintiffs-Appellants allege they lost money that they now seek to recover—a clear Article III injury that gives them a direct stake in the litigation. Whether ERISA ultimately affords them a right to recover that money goes to the merits of their claims, not their standing to assert those claims. *See id*. To hold otherwise would "effectively collapse [the] evaluation under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim into an Article III standing evaluation." *Id*.[2]

**Second**, MetLife is simply wrong that its conduct here does not implicate Plaintiffs-Appellants' ERISA rights. MetLife's argument rests on the premise that the "*only* legally protected interest" a participant in a defined benefit plan has under ERISA is "in receiving the benefits from an employer . . . that 'they are legally and contractually entitled to receive' under the plan.'" Opp. at 33-34

---

[2] MetLife argues in a footnote that courts may properly conflate standing and merits because "standing 'often turns on the nature and source of the claim asserted.'" *See* Opp. at 34 n.5 (quoting *Associated Builders & Contractors W. Pennsylvania v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 288 (3d Cir. 2023)). But the case MetLife quotes does not support that proposition—it merely explains that an injury "must have a close relationship to 'a harm traditionally recognized as providing a basis for a lawsuit in American courts'" to support standing, and gives "monetary harm[ ]" as a specific example. *Associated Builders*, 81 F.4th at 287-88 (citation omitted). MetLife's attempt to blur the line between standing and merits is squarely foreclosed by this Court's binding precedent. *See, e.g.*, *Cottrell*, 874 F.3d at 164. None of the cases it cites supports the contrary proposition. *See, e.g.*, *Bauer v. Mortg. Elec. Registration Sys., Inc.*, 618 F. App'x 147, 149 (3d Cir. 2015) (holding the plaintiff lacked standing to challenge an assignment of his mortgage from one institution to another that had no concrete impact on the plaintiff's own legal rights and obligations).

(quoting *Thole*, 140 S. Ct. at 1618) (emphasis added). But no court has ever

circumscribed the rights of defined benefit plan members in the manner MetLife

urges. Certainly, MetLife cites no such authority.

It is settled law that the ERISA rights of participants in defined benefit plans

are much broader than MetLife lets on. As particularly relevant here, the Supreme

Court has held that ERISA broadly permits defined benefit plan participants to

seek "make-whole relief" for losses suffered due to "a breach of trust committed

by a fiduciary encompassing any violation of a duty imposed upon that fiduciary."

*CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011); *see also Gimeno v. NCHMD,*

*Inc.*, 38 F.4th 910, 914-15 (11th Cir. 2022) (listing cases). Courts have routinely

permitted defined benefit plan participants to vindicate that ERISA right through,

as particularly relevant here, disgorgement of excess premiums paid as a result of

the defendant's fiduciary breach. *See, e.g.*, *Menkes v. Prudential Ins. Co. of Am.*,

762 F.3d 285, 296 n.11 (3d Cir. 2014); *see also Nat'l Sec. Sys., Inc. v. Iola*, 700

F.3d 65, 102 (3d Cir. 2012) (explaining ERISA permits courts broad discretion "to

fashion [equitable] relief tailored to the unique circumstances of a case"). And for

purposes of standing, the Court must assume that Plaintiffs-Appellants will be

successful on their claims. *Cottrell*, 874 F.3d at 162. In other words, the Court

must assume that the foregoing authority entitles Plaintiffs-Appellants to the return

of the money they allegedly lost. It is thus hard to see how MetLife can claim that

Plaintiffs-Appellants lack a concrete stake in this litigation under ERISA.

MetLife dismisses this caselaw with the assertion that, while ERISA affords Plaintiffs-Appellants a variety of remedies for the "alleged statutory violation" here, Plaintiffs-Appellants cannot avail themselves of those remedies because they do not "establish [a] constitutionally cognizable injury in fact." Opp. at 35. But this is circular reasoning. MetLife simultaneously argues that Plaintiffs-Appellants lack standing because they have no right under ERISA to recover the amounts they lost, and that they cannot avail themselves of their rights under ERISA to recover the amounts they lost because they lack standing. MetLife has no coherent response because it is simply wrong on the law—both as to standing and ERISA.

**Third**, MetLife's argument assumes the false premise that Plaintiffs-Appellants merely challenge "the level of benefits determined by MetLife and defined by the Plan." Opp. at 33. Not so. Plaintiffs-Appellants bring suit because MetLife illegally took Plan assets that would have been used to fund their health benefits, which necessarily caused Plaintiff-Appellants to pay more. Rather than "complaining about the level of benefits determined by MetLife," *id*., Plaintiffs-Appellants allege MetLife's misappropriation of "plan assets caused a loss to the plan that ultimately harmed [them] and other plan participants," which this Court has held is sufficient to establish Article III standing "[a]t the pleadings stage," and "clearly qualifies as a concrete injury traceable to [the defendant] and redressable by a court." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007). To the extent MetLife means to imply it could have increased Plaintiffs-Appellants'

premiums for *legal* reasons, and so it does not matter the increase here resulted from *illegal* conduct, this argument has no basis in law or logic. *Cf. Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975) (explaining "a lawful end achieved by unlawful means" is not excused from liability).

### C.   Plaintiffs-Appellants have not argued that the Plan was underfunded.

MetLife next takes issue with what it calls a "'shortfall' theory" of injury it contends Plaintiffs-Appellants have raised for the first time on appeal. Opp. at 35-38. MetLife apparently understood Plaintiffs-Appellants to suggest in their opening brief that the Plan became underfunded, creating a risk that it would "be unable to pay promised benefits." *Id*. To be clear, Plaintiffs-Appellants used terms like "deficit" and "shortfall" in their opening brief to describe the loss MetLife caused the Plan, and passed on to the Plan's members, when it took the Plan's assets for itself. *See, e.g.*, Br. at 11, 14, 21. Plaintiffs-Appellants do not contend that the Plan was underfunded—only that money belonging to the Plan that would have defrayed their premiums instead wound up in MetLife's pocket. *See id*.

At this point in its brief, MetLife drops the pretense that it is arguing about Plaintiff-Appellants' standing and overtly begins arguing the merits of Plaintiffs-Appellants' claims. As an initial matter, the merits issues MetLife raises are far afield of anything addressed by the district court. MetLife makes no attempt to justify an exception to the "general rule" that "'a federal appellate court does not

11

consider an issue not passed upon below.'" *Goldenstein v. Repossessors Inc.*, 815

F.3d 142, 149 (3d Cir. 2016) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120

(1976)). This rule applies with special force where, as here, the issue raised on

appeal but not ruled upon by the district court presents a factual dispute. *See id*.

In any event, MetLife's arguments do not bear scrutiny. MetLife bemoans

the "*Twilight Zone* nature" of Plaintiffs-Appellants' claims, asserting Plaintiffs-

Appellants do not allege MetLife "us[ed] prescription-drug rebates for non-Plan

expenses" and do not "dispute on appeal that MetLife used these rebates to pay the

expenses of providing health benefits to participants." Opp. at 36.

This episode of *The Twilight Zone* evidently centers on an alternate reality in

which Plaintiffs-Appellants did not plead that, when MetLife took drug rebates, it

"provided no . . . benefit to Plaintiffs or other participants," the "Plan [did not]

receive any benefit," and "the benefit" of the drug rebates thus "accrued entirely to

[MetLife]." 2 App. 122 (Compl. ¶ 34). In this inverted world, Plaintiffs-Appellants

did not argue in their opening brief MetLife "took these amounts for its own

general corporate use, with no benefit to the Plan." Br. at 8. MetLife truly has

journeyed into "the dimension of imagination." Rod Serling, *Twilight Zone*

*Monologue* (1959).

Unfortunately for MetLife, it must litigate this action in the real world, and

even worse, within the confines of the Federal Rules of Civil Procedure. And so

constrained, MetLife's argument fails. Contrary to the proposition on which its

argument rests, Plaintiffs-Appellants plainly allege that MetLife *did not* use the sums it took from the Plan to fund benefits under the Plan, but simply took those amounts for its own use and enjoyment. *See, e.g.*, 2 App. 122-123 (Compl. ¶¶ 34-35). By taking the rebates MetLife not only violated ERISA, but the Plan document, which obligated MetLife to use these amounts for "Plan expenses." 2 App. 29 (MTD). Plaintiffs-Appellants' allegations control in this factual dispute, even if MetLife's arguments could plausibly be deemed to relate to standing. *See Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014); *Davis*, 824 F.3d at 348.[3]

## II.    PLAINTIFFS HAVE ADEQUATELY PLED A FINANCIAL INJURY.

### A.    MetLife is wrong that allegations of an injury-in-fact must be pled in exacting detail.

The Supreme Court has explained that, to plead an Article III injury, "general factual allegations of injury resulting from the defendant's conduct" suffice, and courts must "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citation omitted). Under this rubric, "the '[i]njury-in-fact element is not Mount Everest'" and is "very generous." *Danvers*, 432 F.3d at 294.

---

[3] MetLife contends for the first time on appeal that it used the rebates it took to pay healthcare claims. Opp. 36-47. That contrasts with the position it took in the district court, where MetLife claimed it simply pocketed these amounts as an "offset" against what it spent funding the Plan. 2 App. 87, 91, 100 (MTD). There, MetLife indicated it did not pay healthcare claims directly, but rather that "[b]enefits under the Plan are funded through differing mechanisms and combinations of mechanisms, including insurance, welfare benefit trusts, health benefit accounts, and contributions from MetLife and electing participants." 2 App. 27 (MTD at 5). The documents MetLife cites do clearly not establish otherwise.

MetLife nonetheless takes the position that this venerable legal standard is "simply wrong." Opp. at 39. It argues that, in cases alleging "price-inflation theories of harm," this Court has required substantial detail at the pleading stage. *Id.* But MetLife misapprehends the authority it cites. The cases MetLife relies upon concern plaintiffs who pled implausibly attenuated theories of economic harm, not plaintiffs who pled straightforward economic injuries in general terms.

In *Finkleman I*, the first case MetLife cites, the plaintiff alleged that he had overpaid for Super Bowl tickets on the secondary market because the NFL illegally reserved the vast majority of tickets for league insiders. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 199-200 (3d Cir. 2016). The Court found the plaintiff had not plausibly alleged that this practice increased the price of tickets on the secondary market because, as a matter of common sense, the NFL's conduct could just as easily result in flooding the secondary market with tickets sold by league insiders, which would *lower* prices. *Id*. at 200. The plaintiff thus failed to overcome "intractable standing problems that may arise when a lawsuit rests on allegations about a hypothetical resale market." *Id*. at 202.

The same type of baseless hypothesizing sunk the plaintiff in the second case MetLife relies upon. In *Thorne v. Pep Boys*, the plaintiff sued a tire dealer that failed to abide by "a federal regulation that requires a tire dealer to help customers register their new tires with the manufacturer." 980 F.3d 879, 883 (3d Cir. 2020). In attempting to explain how the defendant's actions harmed her, the plaintiff

14

argued the defendant "deprived her of the benefit of the bargain when it sold her tires without helping to register them because unregistered tires are worth less than registered tires." *Id*. at 884. This Court rejected that alleged injury because it rested on "speculation about market or firm-level effects," and there was no way of knowing what impact, if any, registration would ultimately have had on the price of the tires the plaintiff had purchased. *Id*. at 887.

These cases do not stand for the proposition that a plaintiff must plead their injury in exacting detail, as MetLife would have it. Rather, as this Court explained when the first case discussed above returned to it in *Finkleman II*, the generous pleading standard afforded plaintiffs in alleging standing is fully compatible with the requirement that the plaintiff plead a plausible injury; the "'ostensible tension is reconciled by distinguishing allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions.'" *Finkelman v. Nat'l Football League*, 877 F.3d 504, 512-13 (3d Cir. 2017) (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015)). The plaintiffs in both *Finkelman I* and *Thorne* lost because their injury rested on vague predictions about hypothetical market forces, as MetLife seems to recognize in its brief. *See* Opp. at 41.

The difference here is plain. Plaintiffs-Appellants' injury does not rest on attenuated predictions about market forces or other hypotheticals. It rests on simple allegations of historical fact regarding what MetLife did and the direct impact its actions had on Plaintiffs-Appellants. Either MetLife charged Plaintiffs-Appellants

15

higher premiums to replace the amounts it took from the Plan or it did not. Plaintiffs-Appellants allege that it did. This may be readily proven (or disproven) to a certainty through discovery into MetLife's actuarial process. As discussed below, Plaintiffs-Appellants' allegations on this score are "specific, plausible, and susceptible to proof at trial." *Finkelman II*, 877 F.3d at 513. As such, they suffice to establish Plaintiffs-Appellants' standing at the Rule 12 stage. *See id*.

### B. The allegations of Plaintiffs-Appellants' complaint are more than sufficient to plead an injury-in-fact.

Plaintiffs-Appellants allege that, "[d]ue to [MetLife's] transfer of drug rebates to itself," they "paid excessive amounts toward the cost of coverage" under the Plan. 2 App. 123 (Compl. ¶ 37). And they further explain why. "To fund the Plan, each year [MetLife] determines the overall cost of coverage" and "reduces this figure to a specific contribution or premium" based on a "fixed formula" applied to "the cost of 'projected medical claims.'" *Id*. ¶ 20 (citation omitted). Under this "fixed formula," Plan members pay "around 30% of overall contributions to the Plan" in premiums while MetLife pays around 70%. *Id*. ¶¶ 20-21.

As reflected in the Plan's tax documents excerpted in Plaintiffs-Appellants' complaint, the Plan has additional "Assets Available for Benefits" used to fund health benefits. *Id*. ¶ 32. MetLife acknowledges in its brief that these self-generated Plan assets (which MetLife generalizes as "investment earnings") are used to

16

defray the contributions needed to fund the Plan; citing to a tax document Plaintiffs-Appellants excerpt in their complaint, it notes that out of "$342 million in contributions toward healthcare benefits in 2021, 26.6% (about $91 million) came from participant contributions, 68.6% (about $235 million) came from MetLife, and 4.7% (about $16 million) came from investment earnings." Opp. at 8 (emphasis added). This seemingly confirms that these self-generated Plan assets are applied to reduce both the 30% share paid by members and 70% share paid by MetLife in funding health benefits under the Plan. *See id*.

The Plan received drug rebates, which the Plan's tax documents reflect were paid to the Plan and constituted Plan "Assets Available for Benefits" no different from "[p]articipant contributions." 2 App. 121-122 (Compl. ¶ 32). But rather that apply those sums to fund Plan benefits, MetLife "transferred [drug] rebates to itself," with no "benefit to Plaintiffs or other participants, who were responsible for paying 30% of annual contributions to the Plan." *Id*. ¶ 34. "[B]ecause MetLife's transfer of rebates to itself reduced the assets available to provide benefits," this "necessarily result[ed] in higher premiums" for Plaintiffs-Appellants and other Plan members. *Id*. ¶ 30.

At the pleading stage, plaintiffs need only "generally allege facts that, accepted as true, make [their] alleged injury plausible." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). It is at least *plausible* that, by taking "Assets Available for Benefits" totaling $65,237,379 from the Plan that otherwise

would have defrayed the cost of funding health benefits, MetLife caused Plaintiffs-Appellants and other Plan members to pay higher premiums. 2 App. 121-122 (Compl. ¶ 32).

MetLife's argument to the contrary starts with semantics. MetLife complains that two paragraphs in Plaintiffs-Appellants' complaint (not cited above) use the phrase "may have" to stand in for the more lawyerly "on information and belief." Opp. at 42-43. But a plaintiff need not employ "precision in terminology or any magic words" to plead standing. *Boudreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 756 (5th Cir. 2021). MetLife cites no authority for the proposition that the choice of phrasing in Plaintiffs-Appellants' complaint, as opposed to its substance, determines their standing. Notably, this semantic quibble is the only aspect of the district court's opinion on this point MetLife attempts to defend; it abandons the balance of the district court's rationale for holding that Plaintiffs-Appellants' injury was merely "speculative and conclusory." *See* Br. at 22-25.

MetLife further spends five pages attacking two paragraphs of Plaintiffs-Appellants' complaint (20 and 30) with blinkered focus. Opp. at 47-51. It justifies ignoring the balance of Plaintiffs-Appellants' complaint by claiming these paragraphs are "the only portions of the complaint Plaintiffs cite to support their premium-inflation theory of injury." *Id*. at 50. But that is simply false. *See, e.g.*, Br. at 2-9, 14, 21 (citing numerous additional paragraphs). Nor, for that matter, is it clear why Plaintiffs-Appellants' standing would depend on the paragraphs cited in

their opening brief as opposed to the substance of their complaint "read as a whole." *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 855 (3d Cir. 2014).[4] Regardless of the reasoning, MetLife fails to grapple with the totality of Plaintiffs-Appellants' allegations. For example, it argues that nothing in Plaintiffs-Appellants' complaint plausibly suggests that the drug rebates it took would otherwise have been used to fund benefits, Opp. at 47-48, but fails even to mention that the Plan's tax documents designated those rebates "Assets Available for Benefits." 2 App. 121-122 (Compl. ¶ 32).[5]

MetLife also contends Plaintiffs-Appellants should have pled additional details, such as the specific "formula for calculating participant premiums" that MetLife employs and the information MetLife "did not include" in its calculation of premiums. Opp. at 48-49 (emphasis omitted). But information concerning the inner workings of MetLife's actuarial process, like any nonpublic corporate information, "tend[s] systemically to be in the sole possession of defendants" prior

---

[4] This argument is a particularly poor fit here given that, as Plaintiffs-Appellants explained in their opening brief, the district court's opinion did not include any significant analysis of the allegations of Plaintiffs-Appellants' complaint and thus gave Plaintiffs-Appellants little to respond to. Br. at 22. MetLife contends that Plaintiffs-Appellants "largely ignor[e] the complaint's 'may have' allegations, which were the focus of the district court's analysis." Opp. at 47. But that is a rather generous characterization of a single sentence of the district court's opinion briefly mentioning one of those paragraphs. *See* 1 App. 12 (Opinion).

[5] MetLife spends pages attacking various cases and publications that address industry norms regarding the calculation of premiums and the use of drug rebates by plan sponsors. Opp. at 44-46. But given that MetLife admits the Plan's benefits were funded in part by the Plan's self-generated assets, *see id*. at 8, and makes no effort to address the fact that the Plan's tax documents designated the drug rebates at issue Plan "Assets Available for Benefits," 2 App. 121-122 (Compl. ¶ 32), this general discussion of what *other* plan sponsors do to fund *other* plans is of marginal relevance.

to discovery. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

Notably, despite filing over 800 pages of excerpted documents with the district

court, MetLife did not include any information about how it calculates premiums.

It is "improper" to dismiss a complaint under Rule 12(b)(1) "before the plaintiff

has had a chance to discover the facts necessary to establish jurisdiction." *Herbert*

*v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992). The rule that courts

must "'presum[e] that general allegations embrace those specific facts that are

necessary to support the claim'" at the pleading stage thus applies with special

force here. *Lujan*, 504 U.S. at 561 (citation omitted).

The cases MetLife cites do little to rehabilitate its argument. MetLife first

points to *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003).

As MetLife concedes, Opp. at 43, *Horvath* was decided on summary judgment,

and so does not address the very different standard that applies here, at the Rule 12

stage. *See Lujan*, 504 U.S. at 561. Moreover, the analysis in "*Horvath* did not

revolve around whether the plaintiff suffered a financial loss" because "[t]he

*Horvath* plaintiff never contended she suffered a financial loss, as her employer

paid all the premiums to the HMO and did not make any deductions from

employee paychecks." *Edmonson*, 725 F.3d at 416-17. Unlike Plaintiffs-

Appellants, the plaintiff in *Horvath* did not "allege that she ha[d] been personally

affected by the" misconduct she challenged. *See Horvath*, 333 F.3d at 453.

20

The Sixth Circuit's opinion in *Loren v. Blue Cross & Blue Shield of Michigan* is similarly unhelpful. 505 F.3d 598 (6th Cir. 2007). In *Loren*, the plaintiffs sued an insurer that caused health plans offered by their employer to overpay for certain services, which they argued led them to pay more for their own health benefits. *Id*. at 608. The Sixth Circuit deemed their injury "conjectural and hypothetical," in part because it was speculative the employer would have "pass[ed] on" amounts it was overcharged to the plan to fund the plaintiffs' health benefits. *Id*. But that is effectively the opposite of the situation before the Court. *Loren* concerns the loss of hypothetical sums of money the plan's sponsor could have saved, and which it might then have chosen to pay into the plaintiffs' health plan to fund the plaintiffs' benefits (or not). *Id*. This case concerns specific funds that were in reality distributed to the Plan constituting the Plan's own "Assets Available for Benefits," which MetLife illegally took for itself, depleting the Plan assets available to fund Plaintiffs-Appellants' benefits. *See, e.g.*, 2 App. 121-122 (Compl. ¶¶ 32, 34). These were amounts that, as MetLife concedes, were required to be applied to "Plan expenses." 2 App. 29 (MTD), which instead were used by MetLife for its own general corporate purposes with no benefit to the Plan. 2 App. 122-123 (Compl. ¶¶ 34-35).

The Ninth Circuit's opinion in *Glanton* does not concern the injury-in-fact requirement of Article III at all. *See Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123 (9th Cir. 2006). Similar to *Loren*, the

*Glanton* plaintiffs sued a third party that allegedly overcharged their health plan for drugs, which they claimed resulted in higher out-of-pocket costs. *Id.* at 1124. The Ninth Circuit held that success in the case would not redress the plaintiffs' injury, as it was speculative that the plan's sponsor would use any money paid back to the plan to benefit the plaintiffs. *Id*. at 1125. But as Plaintiffs-Appellants explain in their opening brief, *see* Br. at 23-25, and MetLife does not dispute, this case does not raise such concerns. Plaintiffs-Appellants sue the Plan's sponsor, not a third party, and the relief they seek includes disgorgement of excess premiums paid by the Plan's members back to those members. *See id*. There is no question but that the return of lost money would redress Plaintiffs-Appellants' injury.[6]

This also distinguishes the Ninth Circuit's opinion in *Winsor*. MetLife characterizes *Winsor* as holding "the plan sponsor's allegedly wrongful conduct" did not plausibly cause the plaintiffs' injury. Opp. at 44. But in *Winsor*, the plaintiffs sued a *third-party insurance broker* hired by their plan's sponsor, alleging it had caused them to pay higher premiums through self-dealing and kickbacks. 62 F.4th at 522. The Ninth Circuit held the plaintiffs had sued the wrong entity to plausibly make that argument—by suing the insurance broker, they

---

[6] As Plaintiffs-Appellants explained in their opening brief, because Plaintiffs-Appellants have standing, they may also seek additional relief under ERISA that "'sweeps beyond [their] own injur[ies]'" to redress harms MetLife inflicted on the Plan and other Plan members. *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022) (quoting *Braden*, 588 F.3d 585 at 593). MetLife does not dispute in its opposition that, because Plaintiffs-Appellants have standing to bring this suit, they may seek relief on behalf the Plan beyond that which will redress the monetary injury they themselves suffered.

22

"leapfrogg[ed]" the entity that set premiums, the plan sponsor, and could not show the plan sponsor "changed . . . employee contribution rates based on" the broker's self-dealing. *Id.* at 521, 523-524. As discussed above, this case does not share the "structural feature[s]" that gave the Ninth Circuit pause in *Winsor*. *Id.* at 523.

## III.    THE DISTRICT COURT CONFLATED ARTICLE III AND STATORY STANDING.

Plaintiffs-Appellants explain in their opening brief that MetLife invited the district court to analyze their (non-jurisdictional) statutory standing under ERISA as if it were relevant to their (jurisdictional) Article III standing. *See* 2 App. 32-33, 37-40 (MTD). MetLife does not dispute that it did so, or that the district court accepted MetLife's invitation, centering its analysis on whether a plaintiff who seeks "extracontractual" benefits states a claim under ERISA. Opp. at 52-53.

Having gotten precisely what it asked for, MetLife nonetheless argues that it "makes no sense" to argue the district court conflated statutory and Article III standing. *Id.* at 52. MetLife reasons that the district court labeled the relevant portion of its opinion "Article III Standing Analysis," cited cases that address Article III standing, and declared that it was applying Federal Rule of Civil Procedure 12(b)(1). *Id.* at 52-53. But as this Court has observed, a district court may "provide[ ] a detailed recitation of standing law" but nonetheless "improperly, if inadvertently, cross[ ] over in [its] analysis from standing to merits." *Cottrell*, 874 F.3d at 163. That is precisely what happened here.

MetLife points to superficial labels the district court applied to its opinion. It makes little effort to explain how the substance of the district court's opinion fits within the rubric of traditional standing analysis. MetLife instead reiterates the argument that whether Plaintiffs-Appellants have stated a claim under ERISA goes to their Article III standing because it determines whether they have "pointed to an invasion of 'legally protected' interests." Opp. at 52-53. That argument fares no better the second time around. *See supra* pp. 7-11. MetLife only confirms that, because it persuaded the district court to adopt this framing, the district court erred.

Finally, MetLife notes that the Court may affirm on any basis supported in the record. Opp. at 53. But it does not dispute that, where a district court commits an error like the one that occurred here, this Court has just as often remanded for the district court to perform the correct analysis in the first instance. *See Potter v. Cozen & O'Connor*, 46 F.4th 148, 158 (3d Cir. 2022). For all the reasons discussed above, the district court's standing analysis is wrong, and the Court may reverse on that basis. But given that the district court applied the wrong legal standard, the Court remains free to simply remand the case for application of the right one.

## CONCLUSION

The Court should reverse the judgment below and remand for further proceedings.

Date: February 1, 2024                    **ENGSTROM LEE LLC**

*/s/ Charlie C. Gokey*
Charlie C. Gokey
Engstrom Lee LLC
729 N. Washington Avenue, Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
cgokey@engstromlee.com

*Attorney for Plaintiffs-Appellants*
*Marla Knudsen, et al.*

25

## CERTIFICATE OF COMPLIANCE

I.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 7, 164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

II.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021, in 14-point Times New Roman.

February 1, 2024                              /s/ *Charlie C. Gokey*
                                              Engstrom Lee LLC
                                              *Attorney for Plaintiffs-Appellants*
                                              *Marla Knudsen, et al.*

**ELECTRONIC DOCUMENT CERTIFICATE**

I, Charles C. Gokey, hereby certify that the text of the electronically filed

brief is identical to the text of the original copies that were served on February 1,

2024, by Federal Express Overnight delivery to the Clerk of the Court of the

United States Court of Appeals for the Third Circuit.

February 1, 2024                           /s/ *Charlie C. Gokey*
                                           Engstrom Lee LLC
                                           *Attorney for Plaintiffs-Appellants*
                                           *Marla Knudsen, et al.*

## CERTIFICATE OF BAR ADMISSION

Pursuant to LAR 46.1(e), the undersigned hereby certifies that he is counsel of record and is a member of the bar of the United States Court of Appeals for the Third Circuit.

February 1, 2024

/s/ *Charlie C. Gokey*
Engstrom Lee LLC
*Attorney for Plaintiffs-Appellants*
*Marla Knudsen, et al.*

**CERTIFICATE OF PERFORMANCE OF VIRUS CHECK**

I, Charles C. Gokey, hereby certify that on February 1, 2024, I caused a
virus check to be performed on the electronically filed copy of this brief using the
following virus software: Microsoft Defender.   No virus was detected.


February 1, 2024                    /s/ *Charlie C. Gokey*
                                   Engstrom Lee LLC
                                   *Attorney for Plaintiffs-Appellants*
                                   *Marla Knudsen, et al.*

## CERTIFICATE OF SERVICE

I, Charles C. Gokey, hereby certify that on February 1, 2024, I caused seven

(7) copies of Appellants' Opening Brief to be served via Federal Express

Overnight delivery to the Clerk of the Court for the United States Court of Appeals

for the Third Circuit, and filed an electronic copy of the brief via CM/ECF.  I also

caused a copy of this brief to be served electronically on the following counsel for

Appellee:

James O. Fleckner
David Rosenberg
Christopher J. C. Herbert
Goodwin Proctor LLP
100 Northern Ave.
Boston, MA 02210

James A. Santos
Goodwin Proctor LLP
1900 N. Street, NW
Washington, DC 20036

February 1, 2024                          /s/ *Charlie C. Gokey*
                                          Engstrom Lee LLC
                                          *Attorney for Plaintiffs-Appellants*
                                          *Marla Knudsen, et al.*